**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| Hand Held Products, Inc., | C. A. No. 12-CV-0768-RGA-MPT |
| Plaintiff, | |
| v. | JURY TRIAL DEMANDED |
| Amazon.com, Inc.; AMZN Mobile LLC; AmazonFresh LLC; A9.com, Inc.; A9 Innovations LLC; and Quidsi, Inc. | |
| Defendants. | |

**JOINT CLAIM CONSTRUCTION BRIEF**

Frederick L. Cottrell, III (#2555)
Jason Rawnsley (#5379)
Richards, Layton & Finger, P.A.
One Rodney Square
920 N. King Street
Wilmington, DE 19801
cottrell@rlf.com
rawnsley@rlf.com

OF COUNSEL:

Martin R. Lueck
Matthew L. Woods
Sara A. Poulos
Thomas C. Mahlum
Lars P. Taavola
Larina A. Alton
Matthew J. M. Pelikan
Robins, Kaplan, Miller & Ciresi L.L.P.
800 LaSalle Avenue, Suite 2800
Minneapolis, MN 55402
612-349-8500

Steven J. Balick (#2114)
Lauren E. Maguire (#4261)
Andrew C. Mayo (#5207)
ASHBY & GEDDES
500 Delaware Avenue
P.O. Box 1150
Wilmington, DE 19899
(302) 504-3700
sbalick@ashby-geddes.com
lmaguire@ashby-geddes.com
amayo@ashby-geddes.com

OF COUNSEL:

David S. Benyacar
Daniel L. Reisner
David Soofian
KAYE SCHOLER LLP
425 Park Avenue
New York, NY 10022
(212) 836-8000
dbenyacar@kayescholer.com
dreisner@kayescholer.com

mrlueck@rkmc.com
mlwoods@rkmc.com
sapoulos@rkmc.com
tcmahlum@rkmc.com
lptaavola@rkmc.com
laalton@rkmc.com
mjmpelikan@rkmc.com


*Attorneys for Plaintiff*
*Hand Held Products, Inc.*

May 1, 2014

dsoofian@kayescholer.com

*Attorneys for Defendants*
*AMAZON.COM, INC.,*
*AMZN MOBILE LLC,*
*AMAZONFRESH LLC,*
*A9.COM, INC.,*
*A9 INNOVATIONS LLC,*
*and QUIDSI, INC.*

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION .................................................................. 1

      i.      Hand Held's Opening Introductory Remarks ........................................ 1

      ii.     Amazon's Opening Introductory Remarks .......................................... 4

      iii.    Hand Held's Opening Remarks in Reply ........................................... 7

      iv.    Amazon's Opening Remarks in Sur-Reply ......................................... 8

II.     DISPUTED CONSTRUCTIONS ................................................... 9

      •      Order of the Steps Recited in the Method Claims ................................. 9

           i.      Hand Held's Opening Position.................................................9

           ii.     Amazon's Answering Position.................................................9

           iii.    Hand Held's Reply Position...................................................10

           iv.    Amazon's Sur-Reply Position.................................................10

      1)     "target" (Claims 1 and 22) ...................................................... 10

           i.      Hand Held's Opening Position.................................................11

           ii.     Amazon's Answering Position.................................................11

           iii.    Hand Held's Reply Position...................................................12

           iv.    Amazon's Sur-Reply Position.................................................14

      2)     "having at least one of optically readable and bar coded information contained thereupon" (Claim 1) / "having at least one of optically readable and bar coded information contained therein" (Claim 22) ................................... 15

           i.      Hand Held's Opening Position.................................................15

           ii.     Amazon's Answering Position.................................................17

           iii.    Hand Held's Reply Position...................................................20

           iv.    Amazon's Sur-Reply Position.................................................21

      3)     "continuously displayed image video signal" (Claim 1) / "continually displaying a real-time image of said target" (Claims 1 and 22) ........................... 23

i.      Hand Held's Opening Position.................................................23

ii.     Amazon's Answering Position ................................................24

iii.    Hand Held's Reply Position ...................................................27

iv.    Amazon's Sur-Reply Position ...............................................28

4)    "selectively capturing and storing an instantaneous image of said target into the memory of a computer" (Claim 1) / "selectively capturing…an instantaneous image" (Claim 1) / "selectively capturing at least one image displayed by said display means" (Claim 22) ...................................................... 30

i.      Hand Held's Opening Position.................................................30

a.  "selectively capturing and storing an instantaneous image of said target into the memory of a computer" (Claim 1) .................30

b.  "selectively capturing…an instantaneous image" (Claim 1) / "selectively capturing at least one image displayed by said display means" (Claim 22) ...........................................................33

ii.     Amazon's Answering Position (for both of HHP sections "a" and "b" above) ............................................................................34

1.  Selectively ...........................................................................34

2.  "capturing" .........................................................................38

3.  "an instantaneous image"....................................................40

4.  "storing" .............................................................................41

iii.    Hand Held's Reply Position ...................................................41

a.  "selectively capturing and storing an instantaneous image of said target into the memory of a computer" (Claim 1) .................41

b.  "selectively capturing…an instantaneous image" (Claim 1) / "selectively capturing at least one image displayed by said display means" (Claim 22)...........................................................42

1.  Selectively ...........................................................................42

2.  Capturing............................................................................44

3.  "an instantaneous image"....................................................45

iv.     Amazon's Sur-Reply Position (for both of HHP sections "a" and "b" above) ..................................................................46

     1.  "selectively" ........................................................................46

     2.  "capturing" ..........................................................................47

     3.  "an instantaneous image" ..................................................49

     4.  "storing" .............................................................................49

5)    "Storing" (Claim 1) ............................................................... 49

    i.    Hand Held's Opening Position....................................................49

    ii.   Amazon's Answering Position.....................................................50

    iii.  Hand Held's Reply Position........................................................50

    iv.  Amazon's Sur-Reply Position .....................................................51

6)    "bar-coded information"(Claims 1, 22, 23) / "bar-code readable information" (Claim 1) ........................................................... 52

    i.    Hand Held's Opening Position....................................................52

    ii.   Amazon's Answering Position.....................................................53

    iii.  Hand Held's Reply Position........................................................55

    iv.  Amazon's Sur-Reply Position .....................................................56

7)    "decoding bar-code information if bar-code readable information is contained on said instantaneous stored image" (Claim 1)...................................... 57

    i.    Hand Held's Opening Position....................................................57

    ii.   Amazon's Answering Position.....................................................58

    iii.  Hand Held's Reply Position........................................................58

    iv.  Amazon's Sur-Reply Position .....................................................59

8)    "imaging means for imaging a target of interest, said target having at least one of optically readable and bar-coded information contained therein" (Claim 22) ......................................................... 60

    i.    Hand Held's Opening Position....................................................60

      ii.     Amazon's Answering Position ................................................................61

      iii.    Hand Held's Reply Position ..................................................................63

      iv.    Amazon's Sur-Reply Position ...............................................................64

9)     "target…therein" (Claim 22) ....................................................................... 65

      i.      Hand Held's Opening Position ...............................................................65

      ii.     Amazon's Answering Position ................................................................65

      iii.    Hand Held's Reply Position ..................................................................65

      iv.    Amazon's Sur-Reply Position ...............................................................65

10)    "processing means for processing an imaged target" (Claim 22) ........................ 65

      i.      Hand Held's Opening Position ...............................................................65

      ii.     Amazon's Answering Position ................................................................66

      iii.    Hand Held's Reply Position ..................................................................67

      iv.    Amazon's Sur-Reply Position ...............................................................68

11)    "display means for continually displaying a real-time image of said target
       from said imaging and processing means" (Claim 22) ........................................ 69

      i.      Hand Held's Opening Position ...............................................................69

      ii.     Amazon's Answering Position ................................................................70

      iii.    Hand Held's Reply Position ..................................................................70

      iv.    Amazon's Sur-Reply Position ...............................................................71

12)    "image capture means for selectively capturing at least one image
       displayed by said display means" (Claim 22) ........................................ 72

      i.      Hand Held's Opening Position ...............................................................72

      ii.     Amazon's Answering Position ................................................................73

      iii.    Hand Held's Reply Position ..................................................................75

      iv.    Amazon's Sur-Reply Position ...............................................................77

13) "scanning means for scanning said at least one captured image and for determining the presence of bar-coded information in the field of view of said at least one captured image" (Claim 22) ....................................................... 78

    i.      Hand Held's Opening Position.................................................................78

    ii.     Amazon's Answering Position .................................................................79

    iii.    Hand Held's Reply Position....................................................................80

    iv.    Amazon's Sur-Reply Position .................................................................81

14) "decoding means for decoding any bar-coded information detected by said scanning means" (Claim 22) ....................................................................... 81

    i.      Hand Held's Opening Position.................................................................81

    ii.     Amazon's Answering Position .................................................................83

    iii.    Hand Held's Reply Position....................................................................83

    iv.    Amazon's Sur-Reply Position .................................................................84

15) "output means for outputting the decoded bar-coded information to said display means" (Claim 22).......................................................................... 84

    i.      Hand Held's Opening Position.................................................................84

    ii.     Amazon's Answering Position .................................................................85

    iii.    Hand Held's Reply Position....................................................................85

    iv.    Amazon's Sur-Reply Position .................................................................86

16) "discrimination means for discriminating the type of bar-coded information present in said at least one captured image" (Claim 22)...................87

    i.      Hand Held's Opening Position.................................................................87

    ii.     Amazon's Answering Position .................................................................88

    iii.    Hand Held's Reply Position....................................................................89

    iv.    Amazon's Sur-Reply Position .................................................................89

# <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

**Cases**

*Accent Packaging, Inc. v. Leggett & Platt, Inc.*,
    707 F.3d 1318 (Fed. Cir. 2013) ................................................................................... 24, 28

*Altiris, Inc. v. Symantec Corp.*,
    318 F.3d 1363 (Fed. Cir. 2003) ........................................................................................ 10

*Aristocrat Techs. Austl. Pty Ltd. v. Int'l Game Tech.*,
    521 F.3d 1328 (Fed. Cir. 2008) .......................................................................... 68, 74, 85

*AstraZeneca LP v. Apotex, Inc.*,
    633 F.3d 1042 (Fed. Cir. 2010) ........................................................................................ 8

*Baldwin Graphic Sys. Inc. v. Siebert, Inc.*,
    512 F.3d 1338 (Fed. Cir. 2008) ................................................................................... 9, 10

*Biosig Instr., Inc. v. Nautilus, Inc.*,
    715 F.3d 891 (Fed. Cir. 2013),
    *cert. granted*, 134 S. Ct. 896 (2014) .............................................................................. 17

*Cadence Pharm., Inc. v. Paddock Labs. Inc.*,
    886 F. Supp. 2d 445 (D. Del. 2012) ................................................................................ 25

*Catalina Mktg. Int'l., Inc. v. Coolsavings.com, Inc.*,
    289 F.3d 801 (Fed. Cir. 2002) ................................................................................... 23, 27

*Default Proof Credit Card Sys., Inc. v. Home Depot USA, Inc.*,
    412 F.3d 1291 (Fed. Cir. 2005) .......................................................................... 61, 73, 75

*Elcommerce.com Inc. v. SAP AG*,
    No. 2011-1369, 2014 U.S. App. LEXIS 3357 (Fed. Cir. Feb. 24, 2014) ......................... 82

*EON Corp. IP Holdings, LLC v. FLO TV Inc.*,
    CV 10-812-RGA, 2014 WL 906182 (D. Del. Mar. 4, 2014) .............................. 68, 74, 85

*Finisar Corp. v. DirecTV Group, Inc.*,
    523 F.3d 1323 (Fed. Cir. 2008) ................................................................................. 44, 76

*Finjan, Inc. v. Secure Computing Corp.*,
    626 F.3d 1197 (Fed. Cir. 2010) ....................................................................................... 13

*Halliburton Energy Servs., Inc. v. M-I LLC*,
    514 F.3d 1244 (Fed. Cir. 2008) .................................................................................... 1, 15

*Harris v. Ericsson, Inc.*,
    417 F.3d 1241 (Fed. Cir. 2005) ..................................................................... 76

*Honeywell Int'l, Inc. v. Int'l Trade Comm'n*,
    341 F.3d 1332 (Fed. Cir. 2012) ....................................................................... 9

*In re Wilder*,
    736 F.2d 1516 (Fed. Cir. 1984) ..................................................................... 36

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
    358 F.3d 898 (Fed. Cir. 2004) ....................................................................... 31

*Microsoft Corp. v. Multi-Tech Systems, Inc.*,
    357 F.3d 1340 (Fed. Cir. 2004) ..................................................................... 35

*Net MoneyIN, Inc. v. VeriSign, Inc.*,
    545 F.3d 1359 (Fed. Cir. 2008) ................................................................ 66, 83

*Noah Sys., Inc. v. Intuit Inc.*,
    675 F.3d 1302 (Fed. Cir. 2012) ................................................................ 62, 64

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
    521 F.3d 1351 (Fed. Cir. 2008) ............................................................ 12, 13, 27

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) ............................................................. 8, 11, 30

*Proveris Scientific Corp. v. Innovasystems, Inc.*,
    739 F.3d 1367 (Fed. Cir. 2014) ..................................................................... 25

*Rest. Techs., Inc. v. Jersey Shore Chicken*,
    2007 U.S. Dist. LEXIS 84451 at 830 (D.N.J. Nov. 15, 2007) .......................... 75

*Rexnord Corp. v. Laitram Corp.*,
    274 F.3d 1336 (Fed. Cir. 2001) .................................................................. 8, 44

*SuperGuide Corp. v. DirecTV Enters., Inc.*,
    358 F.3d 870 (Fed. Cir. 2004) ................................................................. 18, 21

*Takeda Pharm Co. v. Zydus Pharms. USA, Inc.*,
    109 U.S.P.Q.2d 1825 (Fed. Cir. 2014) ...................................................... 8, 55

*TecSec v. Int'l Bus. Machines Corp*,
    731 F.3d 1336 (Fed. Cir. 2013) ............................................................... passim

*Thorner v. Sony Computer Entm't Am. LLC*,
    669 F.3d 1362 (Fed. Cir. 2012) ...................................................... 11, 13, 23, 57

vii

*Transclean Corp. v. Bridgewood Servs., Inc.*,
    290 F.3d 1364 (Fed. Cir. 2002) ....................................................................... 29

*United States Surgical Corp. v. Ethicon, Inc*,
    103 F.3d 1554 (Fed. Cir. 1997) ....................................................................... 11

*Univ. of Rochester v. G.D. Searle & Co.*,
    358 F.3d 916 (Fed. Cir. 2004) ......................................................................... 36

*University of Pittsburgh of the Commonwealth Sys. of Higher Education v. Varian
    Medical Sys., Inc.*,
    2014 U.S. App. LEXIS 6559 (Fed. Cir. Apr. 10, 2014) .................................... 76

*Vas-Cath, Inc. v. Mahurkar*,
    935 F.2d 1555 (Fed. Cir. 1991) ....................................................................... 36

*Wenger Mfg., Inc. v. Coating Mach. Sys. Inc.*,
    239 F.3d 1225 (Fed. Cir. 2001) ................................................................. passim

**Statutes**

35 U.S.C. § 112 .................................................................................................... *passim*

I.    INTRODUCTION

    i.    Hand Held's Opening Introductory Remarks

Hand Held's U.S. Patent No. 6,015,088 discloses and claims capturing and decoding bar code information in real time from a continuously displayed video signal of a particular target. 1:8-11. Specifically, the invention allows a video image to be displayed and repeatedly and selectively captured to allow for automatic decoding and outputting of encoded information. 3:21-23.

Notwithstanding Amazon's[1] new found concerns, the '088 patent is straightforward. Most of the terms and phrases are ordinary terms readily understood by both those skilled in the art and lay jurors. Thus, Hand Held proposed 8 terms for construction – the "selectively capture" limitation that had been at the center of all previous discussions of claim construction and 7 additional apparatus limitations. Hand Held believes that the remaining terms can be understood by their plain and ordinary meaning and redefining those terms is unnecessary. In contrast, Amazon proposed 18 terms, many of which improperly import limitations from the preferred embodiment into the claims. In addition, Amazon now claims that many of the basic phrases the parties have been citing for the past nine months are indefinite[2] – even while identifying intrinsic evidence and occasionally providing an alternative construction. To succeed on its indefiniteness arguments, Amazon must demonstrate by clear and convincing evidence that the claims are insolubly ambiguous. *Halliburton Energy Servs., Inc. v. M-I LLC*, 514 F.3d 1244, 1249-50 (Fed. Cir. 2008) (claims are indefinite only when "a person of ordinary skill in the art

---

[1] "Amazon" refers collectively to Defendants.

[2] Amazon has not explained its indefiniteness arguments regarding any proposed term. In so far as Amazon bears the burden of demonstrating indefiniteness by clear and convincing evidence, Hand Held reserves the right to provide additional arguments, intrinsic evidence, and extrinsic evidence on these issues in response to Amazon's opening brief regarding any term.

could not determine the bounds of the claims, i.e., the claims were insolubly ambiguous."). Amazon cannot make such a showing.

From the beginning of the case, Amazon has raised a singular claim construction issue – how to construe the phrase "selectively capture."  Amazon identified this term as the central issue in the case when it filed its Rule 12 motion to dismiss based on this term.  D.I. 16, 17, 20, 22.  Amazon repeatedly raised this term throughout discovery in hearings the last half of last year and early this year.[3]  And at the Technology Tutorial, Amazon provided non-infringement theories based solely on this term.  Now in the claim construction phase, Amazon has taken the position that 17 additional terms need to be construed and/or are indefinite, including the most basic phrases such as "bar-coded information" and "target."  During the parties' meet and confer, Amazon provided no explanation for why it now found so many terms indefinite, after all the effort to date.  Consequently, many issues have not been focused or narrowed for resolution by the Court.

As the Technology Tutorial demonstrated, the parties actually agreed on the general workings of the technology with the important exception of the selectively capturing step. During the tutorial, Amazon doctored Figure 1 of the patent by adding lines to the figure that are not in the patent in an attempt to create an additional undisclosed limitation in the claims.  At the time, Hand Held objected to this surgery and indicated that it would correct the misimpression as part of claim construction.  Taavola Ex. A, Tutorial Transcript 60:12-20.  Amazon did not present an accurate representation of the preferred embodiment and much of Amazon's claim construction arguments stem from this fictitious and erroneous depiction.  What Figure 1 shows

---

[3] Amazon raised the term at the October 9th, November 6th, December 16th and January 10th hearings.

and patent discloses is that upon loading of the program, a set of system parameters will be set

and activated including defining the initial size of images, the mode of decoding the barcode, the

mode of triggering a decode operation and setting any other system parameters.  4:36-40.  When

the "camera" is turned on, the Imaging Optics 16 and Image Sensor 14 will receive and focus an

image of the target.  3:58-62.  Frame Grabber 18 takes the images from the Image Sensor 14 and

places it on a common bus 28 to send to the Output/Display 30.  The patent explicitly discloses

that, in the preferred embodiment, Frame Grabber 18 converts the analog signals from the Image

Sensor 14 to digital signals which are sent to the Output/Display 30.  4:64- 5:2.



Contrary to the disclosures in the patent and Figure 1, Amazon contended, during the

Technology Tutorial, that to display the image required an analog signal.  Amazon now attempts

to limit the claims to this analog display.  Because this argument is not supported by the

specification, during the Technology Tutorial, Amazon added a red wire analog cable to Figure

1.  Taavola Decl. Ex. B, Technology Tutorial slide 25.  According to Amazon, "[t]he red wire is

connecting the frame grabber to the monitor so that the video comes into a camera can go back

out on that red wire and be shown on the monitor…that's an analog cable." Taavola Decl. Ex. A,

44:1-7.  This red wire analog cable was created by Amazon.  *Id. at* 62:16-63:2.  It is not shown or referenced even as part of the preferred embodiment, let alone, a limitation on the patent claims.  In fact, Amazon admits that "with respect to what's going to the monitor, the patent doesn't use the word analog."  *Id. at* 62:24-63:2.

And many of Amazon's constructions are based on this incorrect portrayal of the disclosure.  The preferred embodiment does not disclose a wire analog cable to send images to the display.  Rather, in the preferred embodiment, Frame Grabber 18 performs an "analog to digital conversion to provide an array of pixels as defined by the default parameters which is displayed as a continuous video signal in the monitor 30 per block 120." 4:64 –5:2.  Thus, the preferred embodiment teaches that every image from Imaging Optics 16 and Image Senor 14 is sent in digital form from Frame Grabber 18 to the Output /Display 30.  This is the exact opposite of what Amazon represented in adding the fictitious red wire analog cable.

### ii.       Amazon's Opening Introductory Remarks

The written description of the asserted '088 patent is very clear about what the alleged invention is.  After a user takes a picture of an object using conventional camera equipment, that picture is automatically loaded into a conventional barcode scanning program, which will attempt to decode any barcodes in the picture.  This automatic loading saves the user the trouble of having to manually load the picture into the barcode scanning program as was allegedly required in the prior art.  The automatic loading is the invention.

Amazon does not use this invention.  Amazon does not make any products which permit users to take pictures for use in barcode scanning.  Unfortunately, however, HHP is unwilling to let the merits stand in the way of its campaign to monetize its patent.  Consequently, it now asks this Court to rewrite the patent, to change many claim limitations and to completely ignore others.  For example, as the Court is by now well aware, the claims require "selectively capturing

4

and storing" a digital picture.  Yet, the Court can look high and low throughout HHP's brief and not find any acknowledgement that anything whatsoever has to be done in a selective way.  Nor will the Court find any trace of the "capture" limitation in HHP's construction.  HHP hopes that by ignoring these claim limitations, they will somehow go away.

The Court will find many other examples of HHP rewriting and ignoring claim limitations in its brief: (i) one claim limitation requires that there be "at least one of" each of a list of things, and HHP asks the Court to remove the "at least one of" limitation completely and to construe the items in the list as all referring to the same thing; (ii) the claims require that many different types of information be present, such as "optically readable" information, "bar coded information," "bar-code information" and "bar-code readable information," yet HHP does not even attempt to assign discrete meanings to these different terms; (iii) HHP construes a claim limitation requiring that an output be sent to a computer monitor as also covering saving to an ASCII file, sending messages to a host processor, saving in a keyboard buffer, etc.[4]  As explained below, this list goes on and on.

HHP's attempts to rewrite the claims must be rejected.  The words that are actually in the claims must be construed, and when claim limitations cannot be construed because they are insolubly ambiguous, they are indefinite.  For the reasons explained below, application of these principles require adaptation of Amazon's proposed constructions and positions.

### THE INVENTION ACCORDING TO THE '088 SPECIFICATION

U.S. Patent No. 6,015,088 (the "'088 patent") is directed to a system that combines a conventional video camera, a general purpose computer, a conventional video capture card and conventional barcode decoding software to allow a user to take a snapshot of an object having

---

[4] *Infra* at 83.

barcodes on it so that the barcodes can be decoded.  *See* 1:15-64, 3:53-67, 4:6-10, 4:62-64, 5:3-8, 7:28-36.[5]  According to the specification: (i) a user points the video camera at an object having a bar code on it and the video camera generates a live video display of the object on a computer monitor (*see* 4:62-5:8, 5:20-22, 10:27-28, 12:17-19); (ii) the user snaps a picture of the object (literally, a "snapshot," according to the patent) (*see* 4:44-54, 5:9-30, 10:29-30, 12:20-21) when the user determines by looking at the video display that the image of the object is properly resolved (*see* 5:9-11; 5:20-22); (iii) within the computer, the digital snapshot is generated by the video capture card (*see* 4:44-54; 5:22-27); (iv) the snapshot is stored; (*see* 5:11-13; 5:24-27) and (v) the barcode decoding software automatically decodes barcodes within the snapshot.  *See* 5:31-6:38; 10:31-36; 12:22-27.[6]  The alleged invention is the automatic decoding of the barcodes after the user takes the snapshot.  2:54-57.  According to the specification, prior art systems required the user to manually open a separate barcode decoding program after taking the snapshot, load the file containing the snapshot into the barcode decoding program, and then run the barcode decoding program.  2:6-15; 2:37-43.[7]

The specification discloses three different ways that a user can take the snapshot to be automatically loaded into the barcode decoding program: (i) the user can press a designated key on the computer keyboard, referred to as a "Hotkey" (4:46-48); (ii) the user can click a mouse

---

[5] References are to column and line numbers of the '088 patent, available as exhibit A to the parties' Joint Claim Construction Chart (D.I. # 152).  References to exhibits to the Joint Claim Construction Chart will herein be referred to as "JCC Ex."

[6] This operation is depicted in Amazon's Technology Tutorial slides 9-47, available as exhibit 10 to the Bajaj declaration.  References to exhibits to the Bajaj declaration will herein be referred to as "Bajaj Ex."  *See also* Dec. 19, 2013 Tr. at 38:12-59:11, available as exhibit 1 to the Soofian declaration.  References to exhibits to the Soofian declaration will herein be referred to as "Soofian Decl. Ex."

[7] See Bajaj Ex. 10 at slide 7.

button (4:51); or (iii) the user can set a timer indicating the amount of time the system should wait before snapping the picture.  (4:51-54).  This last mode of operation is similar to the manner in which a user of a digital camera can set a timer so that he himself can get into the picture.[8] These three different modes of operation are shown on slides 12-17 of Amazon's technology tutorial.  Bajaj Ex. 10; *see also* Soofian Decl. Ex. 1, 38:12-40:12.

As described above, the prior art component that captures the snapshot is called a "video capture card" or "frame grabber."  *See* 4:3-5.  The video capture card is inserted into a personal computer, and it receives analog video from the video camera.  *See* 4:5-10.  After aiming the video camera at a target, the user takes a snapshot by clicking a mouse, pressing a key on a keyboard or waiting the for the timer interval to expire, which causes a "trigger" message to be sent to capture the snapshot.  In response to the "trigger" message, a single digital frame generated by converting an instant of the analog video into digital format is output for storage.  It is that frame upon which the barcode decoder operates.  *See* 5:9-33.

All of the claims terms in dispute must be construed in view of this disclosure.  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005) ("The claims . . . do not stand alone.  Rather, they are part of 'a fully integrated written instrument'" and "'must be read in view of the specification, of which they are a part.'")

### iii.        Hand Held's Opening Remarks in Reply

Hand Held's constructions are based upon the intrinsic record: the disclosures in the specification; the prosecution history; and the state of the art at the time of filing of the patent application.  In contrast, Amazon's proposed constructions rely heavily on extrinsic evidence in

---

[8] Because the user sets the timer (Soofian Decl. Ex. 2, HHP Technology Tutorial at 34), the user will be able to look at the display to set up the picture and will know when a picture is being taken based on the elapsed time he or she sets.

the form of a declaration from its expert witness, contrary to the hierarchy of evidence prescribed

by the Federal Circuit since *Phillips*.  Hand Held believes that claim construction disputes can

and should be resolved primarily on the intrinsic record, but offers the Declarations of Dr.

Andrew Wolfe, Dr. David Allais and the testimony of the inventors in response to Amazon's

submissions.  When Amazon does resort to the intrinsic record, it goes to the other extreme and

attempts to limit the claims to specific embodiments without pointing to any disclaimer or

limiting language.  This also is contrary to accepted rules of claim construction.  *Rexnord Corp.*

*v. Laitram Corp.*, 274 F.3d 1336, 1344 (Fed. Cir. 2001).

      Amazon's indefiniteness arguments are particularly suspect.  Amazon has failed to offer

any expert opinion that any claim is insolubly ambiguous, despite submitting a 21-page expert

declaration on other issues.  Instead, Amazon relies solely on attorney argument, often times

hedging its bets and proposing a construction to terms which it claims are insolubly ambiguous.

This falls far short of the clear and convincing standard.  *Takeda Pharm Co. v. Zydus Pharms.*

*USA, Inc.*, 109 U.S.P.Q.2d 1825, 1830 (Fed. Cir. 2014).

### iv.       Amazon's Opening Remarks in Sur-Reply

      The Federal Circuit explained in Phillips that a claim term should be given its accepted

meaning in the field of the invention unless the specification clearly indicates intent to ascribe a

different meaning to the term.[9]  To assist courts in applying this principle, the Federal Circuit

sanctioned the use of expert testimony to establish that a claim term has an accepted meaning in

the pertinent field.[10]  That is the reason Amazon submitted the expert declaration of Dr. Bajaj

with its Answering Brief.  He explains that disputed claim terms of the '088 patent have plain

---

[9] *See Phillips*, 415 F.3d at 1312-14 (Fed. Cir. 2005).

[10] *Id*. at 1318; *accord AstraZeneca LP v. Apotex, Inc*., 633 F.3d 1042, 1053 (Fed. Cir. 2010).

meanings in the art that are identical to their meanings in the specification and to Amazon's constructions.  Ironically, although HHP criticizes Amazon's submission of the Bajaj declaration, it also criticizes Amazon for not using an expert to opine that claim terms are indefinite.  Expert testimony for that purpose is unnecessary.[11]

## II.   DISPUTED CONSTRUCTIONS[12]

- ### Order of the Steps Recited in the Method Claims

### i.   Hand Held's Opening Position

Amazon argues that steps of the method claims must occur in the recited order.  However, as a general rule is that method claims are not limited by their recited order.  *See Baldwin Graphic Sys. Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1345 (Fed. Cir. 2008) ("although a method claim necessarily recites the steps of the method in a particular order, as a general rule the claim is not limited to performance of the steps in the order recited, unless the claim explicitly or implicitly requires a specific order."  Amazon has not provided any basis or evidence requiring a specific order.  D.I. 152.  Therefore, Hand Held reserves the right to provide additional argument and evidence on this issue.

### ii.   Amazon's Answering Position

HHP's insistence that the steps of the processes claimed in the '088 patent need not occur in order defies common sense.  *Supra*.  Logic dictates that aiming the camera at the target must occur before the video of the target is displayed, that selective capture and storage be based on the displayed image, and that any decoding of the barcodes within the stored image can only

---

[11] *Honeywell Int'l, Inc. v. Int'l Trade Comm'n*, 341 F.3d 1332 (Fed. Cir. 2012) (invalidating claim as indefinite without relying on expert testimony).

[12] "JCC" refers to entries in the parties' Joint Claim Chart (D.I. # 152).

occur after the image has already been captured and stored.  *See Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1369 (Fed. Cir. 2003) ("we look to the claim language to determine if, as a matter of logic or grammar, [the steps] must be performed in the order written.")

### iii.    Hand Held's Reply Position

The general rule is that methods claims are not limited by their recited order.  *See Baldwin Graphic Sys.*, 512 F.3d at 1345.  Amazon cites no evidence or provides no analysis of the claim language to demonstrate that the claims explicitly or implicitly require a specific order.  Amazon simply claims that "logic dictates" the order.  Logic does not dictate that every step of the claim be practiced in the recited order.  Amazon contends that the user practices the aiming step.  *Infra* at 37 n.30.  Logically, the system could turn on the camera with the barcode in the field of view prior to the camera being "aimed" at the barcode.  Logic does not dictate otherwise.  In addition, as described above, the determining limitation and the decoding limitation occur concurrently.

### iv.    Amazon's Sur-Reply Position

HHP asserts that claim 1 does not require that the steps be performed in order because the step of displaying the target on the monitor could be performed before the step of aiming the camera at the target if the target is in the camera's field of view when the camera is first turned on.  *Supra*.  HHP is again wrong.  Claim 1 requires displaying an image of "***said*** target," which refers to the target that was aimed at.  The aiming must therefore occur first.

### 1)    "target" (Claims 1 and 22)

| Hand Held's Proposed Construction | Amazon's Proposed Construction |
|---|---|
| No construction necessary - plain and ordinary meaning | an object |

### i.      Hand Held's Opening Position

The terms "target" and "target…therein" can be readily understood and need not be construed.  *See United States Surgical Corp. v. Ethicon, Inc*, 103 F.3d 1554, 1568 (Fed. Cir. 1997) (claim construction is "not an obligatory exercise in redundancy.").  While Amazon identified these terms as needing construction, during the parties' meet and confer, Amazon could not explain why, simply stating that it would clarify the term for the jury.  No clarification is needed.  A target is anything that is aimed at.  Defining target as simply *an* object, as Amazon argues, is too narrow.  There could be multiple items or objects in the field of view each having a barcode symbol.  The patent discloses and the claims cover reading multiple barcode symbols in the field of view.  2:40-43; 4:54-58; 5:9-15; 6:25-29.  Claim terms are to be given the ordinary and customary meaning.  *See Phillips*, 415 F.3d at 1313 (Fed. Cir. 2005).  "There are only two exceptions to this general rule: 1) when the patentee sets out a definition and acts as his on lexicographer, or 2) when the patentee disavows the full scope of the claim term either in the specification or during prosecution." *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012).  Amazon has not shown that any of these exceptions apply.  Moreover, Amazon's proposed construction fails to clarify the original term.

### ii.      Amazon's Answering Position[13]

Both claims 1 and 22[14] require that a snapshot be taken of "a target." The specification is clear that a "target" is an object on which barcodes may be present.  2:16-19; 5:9-15; 5:20-27.

---

[13] In an effort to avoid burdening the Court, Amazon will ignore HHP's repeated mischaracterizations of what Amazon said or did not say during the parties' meet and confer. *Supra* at 11; *infra* at 15, 57.

[14]  The asserted claims are claims 1, 8, 10, 12, 22 and 23.  Claims 1 and 22 are the only asserted independent claims.

Indeed, the specification uses the terms "target" and "object" interchangeably.  *Compare* 4:62-64 (referring to "target T" in Fig. 2) *with* 3:55-62 and 5:9-22 (referring to "object T" in Figs. 1 and 2).  Amazon's construction that a "target" means "an object" follows the specification's definition.

HHP argues that Amazon's construction is "too narrow" because it restricts a "target" to being "*an* object" and thus excludes "multiple items or objects in the field of view each having a barcode symbol." *Supra* at 11.  HHP does not explain as a matter of plain English how "a target" can mean "multiple objects," especially when "target" and "object" are synonymous according to the specification.  Moreover, HHP's argument that the disclosed invention can operate on a picture taken of multiple objects has no support in the specification, which only describes "***a*** target having multiple symbols" (1:58-62) and "***a*** target of interest [that] includes widely scattered symbols" (2:16-19).  Thus, although the specification discloses taking a picture of one object containing multiple symbols, it does not disclose taking one picture of two objects and decoding the barcodes contained on both objects.

Notwithstanding HHP's request that the Court not construe "target," the Court should construe it because the parties dispute its meaning.  This claim construction dispute cannot be left for the jury to resolve.  *SeeO2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co*., 521 F.3d 1351, 1360 (Fed. Cir. 2008) ("When the parties raise an actual dispute regarding the proper scope of these claims, the court, not the jury, must resolve that dispute.").  For the reasons explained above, Amazon's construction of "target" should be adopted.

### iii.   Hand Held's Reply Position

The term "target" requires no construction.  A target is anything that is aimed at.  In other words, what it in the field of view.  The intrinsic record demonstrates that the inventors were using this commonsense plain and ordinary definition.  During prosecution, the patentee

explained that "the determining and decoding process allows the entire field of view of the image to be scanned and all bar coded information (which may include several different symbologies 10.2D etc.) which may be indiscriminately located in the image to be output."  JCC Ex. D; *see also,* Claim 16.  Thus, the patentee understood that the target was what is in the field of view of the image.

Amazon is incorrect that the Court must construe this term instead of applying its plain and ordinary meaning.  *O2 Micro* does not stand for the proposition that a party can create a dispute and force the Court to construe that term.  *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1207 (Fed. Cir. 2010) (affirming a Court's adoption of plain and ordinary meaning of a disputed term).  Claim terms are to be given the ordinary and customary meaning with only two limited exceptions.  *Thorner*, 669 F.3d at 1365.  Amazon has not shown that any of these exceptions apply.

Nonetheless, Amazon's proposed construction is wrong, because it limits the term "target" to a single object.[15] Amazon's argument rests solely on the faulty premise that the patentee used the terms "target" and "object" synonymously in the patent.  This is incorrect.  The patent only uses the term "object" to describe the target in its discussion of the preferred embodiment.  3:53-62; 5:9-22.  The claims, the background of the invention and the summary of the invention, use the term "target of interest," and recognize, for example, that the target of interest may have "widely scattered symbols." 2:16-17.  In the patent, then, an object is a subset of a target, not a synonym.  Amazon's narrow construction creates greater confusion for the jury.

---

[15] Prior the parties exchanging claim terms, Amazon filed its supplemental invalidity contentions.  For this very claim term, Amazon asserts that a prior art reference that "aims" at two objects with barcodes anticipates the claim.  Taavola Decl. Ex. D, Amazon's Supplemental Invalidity Contentions.

For example, if the image was a grocery shelf with two cans of corn each containing bar code. What is the object?….the shelf?….the first can of corn?…the second can of corn? The jury should not be faced with this added confusion when the plain meaning of target is simply what is in the field of view.

Amazon chose not to provide argument for its construction of "target…therein" in connection with its construction for "target." Rather, Amazon grouped those arguments with the term "imaging means." Hand Held will fully respond to Amazon's arguments in Section II, G.

### iv.     Amazon's Sur-Reply Position

HHP argues that "a target" means anything in the field of view.  That is not the plain meaning of "target."  The plain meaning of "a target" is "some*thing* aimed or fired at."  Soofian Decl. Ex. 6, The American Heritage Dictionary 1836 (3d ed. 1992).  When a Navy SEAL sniper aims at a terrorist, the trees behind the terrorist in the viewfinder are not the "target."  HHP points to nothing in the specification or prosecution history, which indicates an intention to alter the plain meaning of "target."  And although HHP concedes that "a target" and "an object" are used synonymously in the specification, it contends that is only true in a "preferred embodiment."  However, there are no other embodiments disclosed.  Finally, HHP's construction must be rejected because it makes the claimed step of "aiming an imaging apparatus at a target" impossible to accomplish.  If whatever is in the field of view is the target, then there can never be anything to aim at — whenever the camera is turned on the target is by definition in the field of view.[16]

---

[16]  HHP's reliance on Amazon's invalidity contentions is misplaced, as Amazon obviously could not risk basing its invalidity contentions on only Amazon's constructions.

2)   **"having at least one of optically readable and bar coded information contained thereupon" (Claim 1) / "having at least one of optically readable and bar coded information contained therein" (Claim 22)**

| Hand Held's Proposed Construction | Amazon's Proposed Construction |
|---|---|
| Bar-coded information is defined below (see term 6).  The remainder of the phrase is plain and ordinary meaning.<br><br>Alternatively, the target must have at least one set information that is barcoded and optically readable. | Indefinite |

i.     **Hand Held's Opening Position**

This is the first of many instances where Amazon claims that the patent is indefinite.

Amazon identified the phrases "having at least one of optically readable and bar coded

information thereupon" (Claim 1) and "having at least one of optically readable and bar coded

information contained therein (Claim 22) as indefinite.  These phrases are "sufficiently definite

to inform the public of the bounds of the protected invention, i.e., what subject matter is covered

by the exclusive rights of the patent."  *Halliburton Energy Servs., Inc.*, 514 F.3d at 1249.  Even

Amazon finds intrinsic evidence to support this term.  D.I. 152, Chart, #2.

The phrases modify the term target in "said target having at least one of optically

readable and bar coded information contained thereupon" (Claim 1) and "said target having at

least one of optically readable and bar-coded information contained therein" (Claim 22).  An

ordinarily skilled reader would understand that the target must have one set of information that is

barcoded and optically readable.

During the parties' meet and confer, Amazon argued that indefiniteness arises due to use

of the adjunctive term "and" – improperly arguing that the words "having at least one" require a

disjunctive "or."  Such a reading is not supported by the grammar of the claim.  The adjectives

"optically readable" and "bar coded" modify a single noun – information:  "having at least one

*optically readable and bar coded information*" – *not* having at least one of <u>optically readable information</u> and <u>bar coded information</u>.  Thus, the information must be both optically readable and barcoded.  Therefore, the target must have at least one set of information that is optically readable and barcoded.

This reading is supported by the specification.  One object of the invention is to "integrate[] the video capability in a computer to assess and decode *any* bar code readable information found in the video."  2:32-34 (emphasis added).  There are many different types of bar code readers – laser based barcode readers, like those typically seen in supermarkets, and optical based bar code readers.  1:45-53.  Moreover, an optical imager requires that the barcoded information be readable (properly defined and not blurred or occluded).  These phrases are making it clear that the type of barcode reader is optical based.

The prosecution history adds further support for this plain meaning: in a clarifying amendment, the patentee replaced the word "either" in the original claims with the phrase "having at least one of." The patentee *did not* replace the word "and" with "or," as Amazon proposes.  Instead, the patentee left the adjunctive phrase intact, by replacing the word "either" with the phrase "at least one of."  In so far as, "and" was not changed to "or"; the "at least one of" must modify the word "information."  This makes sense in light of the patent's recognition that some targets contain "widely scattered symbols."  2:16-18.  Thus, the amendment shows that the target must be both optically readable and bar coded information.

### ii.     Amazon's Answering Position

Claims 1 and 22 require that the "target of interest" have **"at least one <u>of</u> optically readable and bar coded information contained thereupon [/ therein]."**[17]  (Emphasis added). For a number of reasons explained below, this limitation is "insolubly ambiguous" and "not amenable to construction."  It is therefore indefinite.  *Biosig Instr., Inc. v. Nautilus, Inc.*, 715 F.3d 891, 898 (Fed. Cir. 2013), *cert. granted*, 134 S. Ct. 896 (2014).

The analysis of this limitation must begin with its syntax.  As a matter of plain English, the phrase "at least one of" must reference at least two different things.  For example, it would make no sense to say "at least one of apples."  In this limitation, the two things referenced by "at least one of" are "optically readable" information and "bar coded information."

The applicants' belief that "optically readable" information and "bar coded information" are two different things is confirmed by the prosecution history.  As originally filed, claim 1 required that the target have "***either*** optically readable and bar coded information contained thereupon."  Soofian Decl. Ex. 3, '088 File Hist., Application at 24 (emphasis added).[18]  Clearly, the word "either" must reference two different things.  When the word "either" was later changed by amendment to the phrase "at least one of" (JCC Ex. D at pg. 4), then, the distinction between "optically readable" information and "bar coded information" as separate categories was maintained.

---

[17] Claim 1 requires that the information be *on* the target, whereas claim 22 requires that the information be *in* the target.  The specification does not disclose decoding barcodes in the target, an issue which is addressed in Section 8 below.  In this section, however, that issue is not pertinent, so we refer to "thereupon" or "on" with respect to both claims for convenience.

[18] Claim 22 does not correspond to an originally filed claim.

The question then is: is this claim limitation satisfied if only one of these two types of information is included on the target, or must the target have at least one "optically readable" information AND at least one "bar coded information."  The use of the word "and" between "optically readable" information and "bar coded information" in the claim means it is the latter, as the word "and" is conjunctive (as opposed to the word "or," which is disjunctive).  *See SuperGuide Corp. v. DirecTV Enters., Inc*., 358 F.3d 870, 886 (Fed. Cir. 2004) (construing a claim that used the phrase "at least one of" followed by a list of categories separated by the word "and" to mean that at least one selection be made from each of the categories in the list).  Thus, this claim limitation requires that the target have at least one "optically readable" information and at least one "bar coded information" on it.

The problem is that there is no way to know what "bar coded information" is, or how it is distinguishable from "optically readable" information.  For example, claim 1 alone requires three different types of "information" relating to bar codes: "bar coded information" (10:25-26; 10:31, 10:37), "bar-code information" (10:33) and "bar-code readable information" (10:33-34).  Neither the specification nor the claims explain what the difference is between them.  The phrase "at least one of optically readable and bar coded information contained thereupon" is therefore indefinite because "bar coded information" is indefinite.

In addition, even assuming *arguendo* that "bar coded information" means simply "bar codes," this limitation is still indefinite because bar codes are, by definition, one type of optically readable information:

> **bar code** A code representing characters by sets of parallel bars of varying thickness and separation *that are read optically* by traverse scanning.

Bajaj Ex. 16, IBM Dictionary of Computing 53 (1994) (emphasis added); Bajaj Decl. ¶ 47.

Because bar codes are one type of optically readable information, there is no way to tell what this

limitation means when it requires at least one "optically readable" information *and* at least one "bar coded information."  It is like asking someone to select at least one fruit *and* at least one apple — the request is insolubly ambiguous.

This limitation is insolubly ambiguous for a number of other reasons as well.  For example, what does it even mean to select "at least one . . . information."  What does at least one "optically readable" information mean?  Neither the specification nor HHP provide any answers.

HHP contends that this phrase should be construed to mean that the target has "one set of information that is barcoded and optically readable."  *Supra* at 15.  HHP is thus attempting to vitiate the phrase "at least one of" from the claims completely and to rewrite the claims so that they no longer require that "bar coded information" and "optically readable" information be different things.  HHP even took it upon itself to literally remove the word "of" from the phrase "at least one of" when it quoted this limitation at pages 15-16, *supra*, because its arguments make no sense with the limitation as it is actually written.  HHP's construction must therefore be rejected.

Tellingly, HHP's rewriting of the claims still does not solve the problem that barcodes are, by definition, optically readable.  HHP's construction that information be "barcoded and optically readable" is thus impermissibly redundant.  Recognizing the problem, HHP says that there are two type of barcode readers, "laser based barcode readers" and "optical based barcode readers," and that the claims are referring to barcodes that can be read by the optical type of reader, not the laser reader.  *Supra* at 16.  HHP is wrong because laser based barcode readers are optical readers:

> **bar code scanner** n.  An optical device that uses a laser beam to read and interpret bar codes, such as the Universal Product Codes found on grocery products and other retail items.

Bajaj Ex. 3, The Computer Dictionary 43 (3d ed. 1997); *see also* Bajaj Decl. ¶¶ 48-50.

For all of these reasons, the phrase "at least one of optically readable and bar coded information contained [thereupon/therein]" in claims 1 and 22 is indefinite.

### iii.    Hand Held's Reply Position

Amazon's indefiniteness argument is not based on any substantive evidence.  While Amazon cites to ¶¶47-50 of the Bajaj Declaration for support, these paragraphs do not exist and appear to have been deleted.  *See supra* at 18-19; *compare* Bajaj Decl. which ends at ¶43.  Instead, Amazon relies on attorney argument that ignores the plain English of the claim limitation, and the intrinsic record.  In the claim, the terms "optically readable" and "bar coded" are adjectives that modify the noun "information." The "and" joins the two adjectives.  In the claim, the phrase "at least one of" modifies the noun "information."  Thus, grammar indicates that the target must have at least one set of information, and that information must be optically readable and bar coded.  This is not a choice between two different types of information, but a definition of the characteristics of the "at least one"[19] set of information.

Contrary to Amazon's arguments, one of ordinary skill would understand that information that is optically readable is not necessarily barcoded, and information that is barcoded is not necessarily optically readable.  For example, Allais (U.S. Patent No. 4,794,239) which is cited on the face of the patent and referenced at column 1, line 33 of the specification, describes exactly what barcoded information is – a linear array of bars and spaces that represent binary ones and zeros that are *generally* – but not always - read by optical techniques.  Taavola Decl. Exs. E, Allais Patent 1:15-24, F, Pavlidis Patent 1:14-23.  As recognized by the cited art, not all barcodes

---

[19] Recall that the target of interest may have widely scattered symbols, *i.e*., more than one set of information.

are "optically readable" as they could be implemented in magnetic media or invisible ink.

Taavola Decl. Exs. F 1:22-23, G, Wang Patent 1:20-25; Wolfe Decl. at ¶ 31.

Moreover, even if the bar code is designed to be read optically, that does not guarantee that it is optically readable. According to Allais, there are also practical limitations such as the limitations of a given printing process or minor physical damage to the bar code, which would make a barcode not optically readable. Allais states:

> The contrasting parallel bars and spaces of a bar code have varying widths. Generally, the bars and spaces can be no smaller than a specified minimum width, termed the code's "unit" (or "x-dimension" or "module"). While the theoretical minimum unit size is the wavelength of the light being used to read the bar code, there are other practical limitations. Among them are the desired depth of field of the reading equipment, the limitations of a given printing process, and the robustness of the printed image to be correctly read despite dust, dirt, and minor physical damage.

Taavola Decl. Ex. E 1:25-35; *accord* Wolfe Decl. at ¶ 31. The phrase is sufficiently definite and supported by both the intrinsic record, and intrinsic evidence as well.

### iv.    Amazon's Sur-Reply Position

HHP ignores: (i) the actual claim language, which requires "at least one **of**" "optically readable" information **and** "bar coded information"; (ii) the Federal Circuit's explanation in *SuperGuide* that this syntax requires at least one "optically readable" information and at least one "bar coded information"[20]; and (iii) the originally filed claim, which required "*either*" "optically readable" information and "bar coded information," confirming that the applicants believed these were two separate categories of information. Instead, HHP unabashedly rewrites the claim by inserting the word "set" between "at least one" and "of," thereby changing it from a syntax

---

[20] *SuperGuide Corp.*, 358 F.3d at 885 (Fed. Cir. 2004).

which requires two or more different types of information to a syntax which requires only one "set" of information.  Rewriting the claims like this during claim construction is improper.

In response to Amazon's contention that the claim as written is indefinite because "bar coded information" is a subset of "optically readable information" (for the same reason that "selecting at least one of fruits and apples" would be insolubly ambiguous), HHP says that "one of ordinary skill would understand that information that is optically readable is not necessarily barcoded, and information that is barcoded is not necessarily optically readable."  *Supra* at 20. Instead of helping HHP, this admission validates Amazon's contention that the claims also treat them as two different categories of information and further demonstrates that the claims are indefinite.  It is like asking someone to select at least one fruit and at least one tropical food — because they are overlapping sets, there is no way to tell how many things must be selected. (Would selection of one mango satisfy this request because it fits both categories?)

3)  **"continuously displayed image video signal" (Claim 1) / "continually displaying a real-time image of said target" (Claims 1 and 22)**

| Hand Held's Proposed Construction | Amazon's Proposed Construction |
|---|---|
| For "continuously displayed image video signal:" No construction necessary - plain and ordinary meaning. The preamble is not a limitation.<br><br>Alternatively, the term should be construed consistently with term 3(a) | For "continuously displayed image video signal:" displayed analog video signal |
| For "continually displaying a real-time image of said target:" No construction necessary - plain and ordinary meaning | For "continually displaying a real-time image of said target:" live display of an analog video image of the target |

### i.  Hand Held's Opening Position[21]

The terms "continuously displayed image video signal" and "continually displaying a real time image of said target" can be readily understood and need no further definition.  *See United States Surgical Corp.*, 103 F.3d at 1568.  Claim terms are to be given the ordinary and customary meaning unless the patentee sets out a definition or disavows the full scope of the claim term. *Thorner*, 669 F.3d at 1365.  Amazon has not shown that any of these exceptions apply.

Amazon identified these terms as needing construction.  Amazon's proposed construction fails to clarify the original term and improperly adds limitations not present in the claim. Specifically, Amazon proposes that  "continuously displayed image video signal" is a "displayed *analog* video signal" and "continually displaying a real time image of said target" is "live display of an *analog* video image of the target" – improperly adding the requirement to the otherwise plain meaning of these terms that the video signal be "analog."  Amazon proposed construction

---

[21] This term appears in the preamble of Claim 1.  The preamble is not a limitation to the claim, but provides the context in which the claim operates. *See Catalina Mktg. Int'l., Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002) (a preamble is not a limitation "where a patentee defines a structurally complete invention in the claim body and uses the preamble only to state a purpose or intended use for the invention.")  As such, the preamble does not need to be construed.

stems from Amazon adding the red wire analog cable to the disclosure.  Not only is there is no

basis for limiting the video signal to an analog signal, but the preferred embodiment is disclosed

as a digital signal.  In the preferred embodiment, Frame Grabber 18 is disclosed as converting the

signals from the imaging electronics into digital form for continuous display on the monitor.

4:65-5:2.  Amazon thus proposes a construction that would read out the preferred embodiment,

something that is rarely accepted.  *Accent Packaging, Inc. v. Leggett & Platt, Inc.*, 707 F.3d

1318, 1326 (Fed. Cir. 2013) (interpreting a claim that would exclude the preferred embodiment

"is rarely, if ever, correct." (citation omitted)).  Here, the claim is silent as to whether the signal

must be analog or digital, so there is no reason to impart greater specificity into the claim.  Thus,

there is no basis for Amazon's attempt to limit the video signal to an "analog" signal and this

attempt should be rejected.

### ii.    Amazon's Answering Position

Claim 1 requires that the video signal be "continuously displayed" on the computer

monitor, and claims 1 and 22 require that it be "continually display[ed]."  The inventors explain

in the specification that they will not provide details regarding the meaning of these limitations

because those details are "known to those of skill in the field":

> The image of the target is then converted into analog electrical signals which are
> transmitted to the *frame grabber 18* having circuitry to perform the analog to
> digital conversion to provide an array of pixels as defined by default parameters
> which is *displayed as a continuous video signal in the monitor* 30 per block 120.
> *Details relating to the above are generally known to those of skill in the field, and
> require no further elaboration herein.*

4:64-5:4 (emphasis added).[22]  In view of the inventors' decision to rely on knowledge in the art

to fill in the "details" regarding the "continuous video signal" that is sent to the monitor, Amazon

---

[22] HHP contends that the preamble of claim 1 is not a limitation.  *Supra* at 23 n.21.  However, the
specification describes the invention itself as relating to "decoding bar bode information in real
*Footnote continued on next page . . .*

submits the declaration of Chandrajit L. Bajaj, Ph.D. to explain what that knowledge was.  As Dr.

Bajaj explains, at the time of the invention and today, those skilled in the art would understand

that a "continuous video signal" is an analog video signal (Bajaj Decl. ¶¶ 7 and 19), and that the

disclosed "frame grabber" sends an analog video signal to the computer monitor (Bajaj Decl. ¶¶

37-41).  Therefore, Amazon's construction of the claimed continuously displayed signal is that it

is an analog signal.  The "red wire" in Amazon's technology tutorial about which HHP so

vociferously complains in its opening brief is the wire to the video monitor from the frame

grabber which carries that analog signal, and which is one of the "details" that the inventors

alerted the public would be omitted from the specification.  Bajaj Decl. ¶ 42.

The reason analog signals are referred to as continuous signals in the art is because they

can have any value within a given range.  By way of example, an analog volume control might

permit a stereo user to set the volume at any level between zero and some maximum by turning a

continuously rotating knob.  In contrast, digital signals can only have discrete values.  This is

similar to a digital volume control that might only permit a stereo user to set the volume at

specific pre-defined levels.  *See* Bajaj Ex. 2, Alan Freedman, The Computer Glossary 10-11 (7th

ed. 1995) (*defining* analog); *id*. at 104 (*defining* digital); *see also* Bajaj Ex. 3 at 23 (*defining*

analog); *id*. at 144 (*defining* digital).

The reason the '088 patent so specifically identifies analog signals as being sent to the

computer monitor for display is that, at the time of the invention, computer monitors such as

---

. . . *footnote continued from prior page*

time from a continuously displayed video signal . . ."  (1:8-11).  As such, the preamble is a
limitation.  *Cadence Pharm., Inc. v. Paddock Labs. Inc*., 886 F. Supp. 2d 445, 460 (D. Del. 2012)
(Stark, J) (holding a preamble limiting where the additional step it recited was "underscored as
important by the specification"); *accord Proveris Scientific Corp. v. Innovasystems, Inc.*, 739
F.3d 1367, 1372 (Fed. Cir. 2014).  This has no practical importance, however, as the claims
require "continually displaying a real time image" in their bodies.

those most typically used with the disclosed Compaq Pentium based PC (4:7) were analog monitors, and could only display analog signals.  Bajaj Decl. ¶ 14.  Therefore, the disclosed "frame grabber," which serves as the "video driver" for the computer monitor (5:5-8), must output analog signals to the monitor for display, or the monitor will not be able to display the video.  *Id.* ¶ 15-18 and 33-42.  Not surprisingly, then, that is exactly how the specific brand of frame grabber identified in the specification, the "Flashpoint Lite manufactured by Integral Technologies, Inc." (4:7-9), operates.  *See* Bajaj Ex. 11, Integral Techs., Inc., *FlashPoint 128 Lite Specifications*, FlashPoint® 128 User's Guide, at 85; Bajaj Decl. ¶¶ 37-38.

Unlike Amazon, HHP has chosen to simply ignore the "knowledge of those skilled in the field."  Despite the fact that it has known since the Technology Tutorial that Amazon contends that the disclosed frame grabber supplies analog video to the computer monitor, HHP did not submit one scintilla of evidence with its opening papers to rebut that contention.  For example, HHP does not dispute that the disclosed Flashpoint Light frame grabber supplies analog video to computer monitors in exactly the way Amazon describes.  Nor does HHP identify which computer monitor it alleges could have been wired directly into the computer bus of the disclosed Compaq Pentium 120 based PC to receive digital video in the manner HHP depicts on page 3, *supra*.  Instead, HHP relies only on the specification's disclosure that the frame grabber converts the incoming analog signal into digital.  *Supra* at 3 (citing 4:64-5:2).  Had HHP bothered to investigate how Flashpoint Light frame grabbers operate, it would have known that this conversion is done only for its own internal processing and that the frame grabber converts the signal back into analog in order to send it to a computer monitor.  *See* Bajaj Decl. ¶¶ 43-46.

HHP contends that the Court should not construe these limitations because they have a "plain and ordinary meaning."  However, HHP has not identified any alleged plain meaning.  In

any event, because the parties dispute the meaning of these limitations, the Court should construe them.  *O2 Micro*, 521 F.3d at 1360.

### iii.      Hand Held's Reply Position

Amazon seeks to limit these terms to the display of an analog signal.[23] Yet the claim never uses the term "analog."  The claims are directed to what is being displayed, not *how* the communication is being sent to the display.  How the image is communicated to the display (*i.e.*, via a digital or analog signal) is irrelevant to the claim language.  Any specific implementation was left to those skilled in the art.  4:4-11.  Moreover, the record is clear that digital connections were known at the time.  Wolfe Decl. ¶¶ 16-18.

Amazon's attempt to limit the claims to how the data is communicated is also based on problematic, extrinsic evidence.  Amazon relies heavily on the FlashPoint 128 User's Guide Description of Flashpoint Lite 128 from 1998, yet offers no explanation for why a publication from two years *after* the filing of the application – and for a different product – has any relevance here.  *See* Wolfe Decl. ¶¶ 27-28.  Amazon and Dr. Bajaj carefully avoid claiming that this is *the product* described in the patent.  *See supra* at 26 (asserting that this post-filing publication describes "how the *specific brand* of frame grabber identified in the specification…operates"); *see also*, Bajaj Decl. at ¶28 ("the '088 patent describes the use of a particular video capture card, *FlashPoint Lite* manufactured by Integral Technologies", *compare* Bajaj Decl. at ¶26 ("I examined a User Guide from 1998 for Flashpoint 128, which covers *FlashPoint 128 Lite*.").  Yet

---

[23] Amazon claims that the preamble term "continually displayed image video signal" is a limitation to the claim.  Yet, Amazon does not identify any rationale for making such a claim. *See Catalina Mktg*., 289 F.3d at 808.  In fact, Amazon states that the preamble term is of "no practical importance [] as the claims require 'continually displaying a real time image' in their bodies."  Thus, Amazon has provided no reason as to why the Court must construe the preamble.

there is no testimony explaining why the reported capabilities of this later product reflect the capabilities of any device mentioned in the patent.

Finally, Amazon's construction would read out this preferred embodiment.  Such a reading is rarely accepted.  *Accent Packaging*, 707 F.3d at 1326.  Relying upon the Bajaj Declaration and the 1998 reference, Amazon argues that the signal must be analog because of the existence of the "red cable" it inserts into Figure 1 of the patent.  On this issue, Amazon misunderstands Hand Held's arguments.  The red cable is a fiction because *it is not disclosed in the patent*.  Whether one of ordinary skill could assemble a system in this manner is not a basis for limiting the claim, especially where the specification discloses a different type of connection.  Figure 1 shows that the element 30 output/display is connected to the system bus 28, not by an extra red cable.  Doing this was well known in the art Wolfe Decl. ¶¶ 24-26) and was how the inventors assembled the system.  Taavola Decl. Exs. H at 68-72, I at 86-87.  The frame grabber 18 digitizes all the data coming in from the imaging optics and sends the data over the bus so that it can be processed and continuously displayed, a term which is clear on its face.  *See* Wolfe Decl., ¶¶ 19-23.

### iv.    Amazon's Sur-Reply Position

HHP knows how the specification explains this limitation: video "is displayed as a continuous video signal in the monitor 30," the details of which are "known to those of skill in the field."  4:64-5:4.  HHP also knows that its own inventor admitted[24] that continuous signals

---

[24]  The inventors are being paid by HHP and are represented by HHP's counsel.  HHP even paid them for their time sitting for their depositions.  Soofian Decl. Ex. 7, 17:7-18:6, 22:24-23:17; Soofian Decl. Ex. 8, 10:25-11:2, 12:6-24.  And, contrary to Delaware practice, the inventors improperly discussed their testimony with their counsel during breaks in the depositions.  Soofian Decl. Ex. 7, 160:4-23; Soofian Decl. Ex. 8, 215:20-217:5.  Their admissions are therefore particularly damning to HHP.

are analog signals.  Soofian Decl. Ex. 7, Ehrhart Tr. 171:3-12.[25]  HHP also knows that its own inventors believe that the technology available at the time of the invention required use of an analog display even when the monitor was not connected to the capture card using the "red wire."  Soofian Decl. Ex. 8, Parker Tr. 206:22-207:5.  In view of all of this knowledge, it is incomprehensible how HHP can continue to argue that the "preferred embodiment" is a digital signal to a digital display.  HHP also misses the point when it says that the "claims are directed to *what* is being displayed, not *how* the communication is being sent to the display" because *what* is being displayed is a continuous (*i.e.* analog) signal.

HHP complains that the Flashpoint Lite video capture card relied on by Amazon is a later model (by 2 years) of the same Flashpoint Lite card (by the same manufacturer) cited in the specification.  However, Amazon relied on this simply to explain the capabilities of video capture cards.  Amazon has confirmed that the earlier model referenced in the specification works the same way.  (Second Decl. of Chandrajit L. Bajaj ¶¶ 5-11, 19-21.)

---

[25]  Although HHP's expert Dr. Wolfe also admits that analog signals are referred to in the art as continuous signals (Wolfe Decl. ¶ 23), he relied on common English language dictionaries in forming his opinions.  (*Id*. at ¶ 20).  This is improper.  *See Transclean Corp. v. Bridgewood Servs., Inc.*, 290 F.3d 1364, 1375 (Fed. Cir. 2002).  Dr. Wolfe also performed a test which he claims demonstrates that both analog and digital displays look the same to an "ordinary user." (Wolfe Decl. ¶¶ 21-22.).  This is irrelevant.

4)   **"selectively capturing and storing an instantaneous image of said target into the memory of a computer" (Claim 1) / "selectively capturing…an instantaneous image" (Claim 1) / "selectively capturing at least one image displayed by said display means" (Claim 22)**

| Hand Held's Proposed Construction | Amazon's Proposed Construction |
|---|---|
| For "selectively capturing and storing an instantaneous image of said target into the memory of a computer": Designating a real-time image for attempted decoding, based on one or more conditions and placing it in memory. | See below |
| For "selectively capturing…an instantaneous image" and "selectively capturing at least one image displayed by said display means:" The terms shall be construed as part of the limitation as a whole within the context of the claim, rather the separately. *See* Section 12. | For "selectively capturing…an instantaneous image" and "selectively capturing at least one image displayed by said display means:" At an instant in time selected by the user based on the displayed image, converting the live analog video signal into a single digital frame that is output for storage into computer memory |

  i.  **Hand Held's Opening Position**

    a. **"selectively capturing and storing an instantaneous image of said target into the memory of a computer" (Claim 1)**

This claim limitation has been the central issue in the case. Now that the claim construction process has begun, Amazon has chosen not to construe the limitation as a whole. Rather, Amazon has separated this limitation into its constituent elements, pulling those elements out of context. It is important to read this claim limitation as a whole. As Hand Held has indicated numerous times, "selectively capturing and storing an instantaneous image of said target into the memory of a computer" refers to designating a real-time image for attempted decoding, based on one or more conditions and placing it into memory.

The specification supports this construction. *See Phillips*, 415 F.3d at 1312-17 (the specification is "always highly relevant to the claim construction analysis…it is the single best guide to the meaning of a disputed term."). The specification states that one primary objective of the invention is to "automatically and without human intervention capture and decode a video

input" 2:53-57; 3:14-19; 3:24-25; 5:26-27; 5:30-33; *see also*, Figure 2; col. 5, ll. 9-19.  The thrust

of these disclosures is that this element is directed to designating an image for potential

decoding.

      The specification recognizes that problems arise if the designation occurs before the

image is properly resolved.  2:6-19.  Accordingly, the specification explains that the designation

should be based upon one or more conditions.  These conditions can be set by the program or by

the user.  2:53-57; 4:44-54.  As illustrated by the preferred embodiment, upon loading of the

program, a set of system variables "such as the mode of decoding, of triggering, etc.  are each

activated." 4:36-40.  The mode of triggering is determined by the program in the initial start-up

mode.  This trigger can be a variety of things, but in each instance some sort of condition or set

of conditions is applied.  The preferred embodiment describes in detail three types of triggers –

(1) a "Hot Key" that can be pressed by the user, (2) a mouse button that can be clicked by a user;

and (3) a signal from the processor.  4:44-54.  In addition, the preferred embodiment, recognizes

that a number of triggers or conditions could be set.  *See* Figure 1 "Keyboard, Mouse, Timer,

*Etc.*" 34 (emphasis added).

      In each instance, some set of conditions are going to be applied by the user or the

processor to designate the image for decode.  For example, one condition could be that the image

is properly placed in the field of view.  2:39-44.  Another condition could be that there is a

resolved image (i.e. a focused image) on the monitor.  5:20-22; 2:6-15.  Another possible

condition is that the processor elects to capture images at some set time interval.  4:51-54.  These

are just examples of the type of criteria or conditions that can be set and are not limiting.  *See*

*Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004).  What is important and

how the patent defines this limitation is based on the quality/condition of the image and what is selected for further decoding operations.  *See* 2:6-15.

Hand Held's proposed construction is further supported by the plain meaning of selection.  For example, the New IEEE Standard Dictionary of Electrical and Electronics Terms (1993) defines "selection" in the context of data management, as: "[t]he process of identifying, within a set of items, all items that meet a particular criterion." Taavola Decl. Ex. C, New IEEE Standard Dictionary of Electrical and Electronics Terms 5th Ed., pg. 1183.  After the image is identified, or "captured" the image is placed into memory for decoding or "stored."  These functions are intertwined.  5:9-15.  As is clear from the prosecution history, capturing and storing, while distinct conceptually, are essentially two sides of the same coin.  This limitation initially read "selectively capturing an instantaneous image into the memory of said computer." JCC Ex. D at 4.  The Examiner rejected the claims in view of the prior art reference Baumberger (U.S. 4,908,500), citing col. 2, ll. 44-66.  *See* JCC Ex. B.  The patentee filed a clarifying amendment that added the "storing" term (among others).  JCC Ex. D at 4, 6.  The patentee explained that the "capturing" in Baumberger was different because it was not placing the image into memory for any further processing.  The patentee stated that

> Baumberger fails to either teach or suggest a process which actually permits determining and decoding of bar-coded information in a selectively captured image, while simultaneously displaying a real-time image of a target of interest. The only apparent use of memory storage in the Baumberger reference is for storing data identification information for subscribers, such as in privileged access on a parking garage.

JCC Ex. D at 9.

Thus, the patentee emphasized that what is captured is also stored, unlike in Baumberger where the captured image is not stored; any storage in Baumberger is of different information. *See* JCC Ex. C, Baumberger Patent Figure 1, 2:44-66, Box 7 and 8.

**b. "selectively capturing…an instantaneous image" (Claim 1) / "selectively capturing at least one image displayed by said display means" (Claim 22)**

Hand Held does not believe that these terms should be construed as parsed, because they do not reflect the entire context of the claim element. *See* Section 4(i)(a), *supra*. To the extent, Amazon continues to insist on construction of the portions of the claimed elements, it would result in the following unwieldy construction:

| Claim 1 Element | Claim 1 Element Incorporating Amazon's Proposed Constructions for "selectively capturing…an instantaneous image" and "storing" |
|---|---|
| selectively capturing and storing an instantaneous image of said target into the memory of a computer | At an instant in time selected by the user based on the displayed image, converting the live analog video signal into a single digital frame that is output for storage into computer memory retaining data at a location from which it can be copied at a later time of said target into the memory of a computer. |

This is not claim construction, but claim rewriting. It includes the fictitious and erroneous red wire analog cable by requiring a live analog video signal discussed above. It would also require that the user make the "selection," in direct conflict with the specification, which expressly states that the invention "can automatically and without human intervention capture and decode video input." and discloses that the processor can be programmed to perform the selection automatically. 2:53-56; 4:36-40. Finally, after all of Amazon's protestations that Hand Held never defined "selectively," Amazon's own proposal does not define the term. Amazon's proposed construction simply says that it is "selected by the user based on the displayed image." Amazon's failure to define this term, after all the effort devoted to it, defies explanation.

ii.     **Amazon's Answering Position (for both of HHP sections "a" and "b" above)**

The limitation "selectively capturing and storing an instantaneous image" in claim 1 (the "Selectively Capturing Limitation"), has four constituent claim terms which must each be construed: "selectively," "capturing," "instantaneous image" and "storing."[26]  10:29-30. Amazon's construction of the Selectively Capturing Limitation — "at an instant in time selected by the user based on the displayed image, converting the live analog video signal into a single digital frame that is output for storage into computer memory" — is based on its constructions of those individual claim terms.  In contrast, because HHP's construction of the Selectively Capturing Limitation ("designating a real-time image for attempted decoding, based on one or more conditions and placing it in memory") effectively vitiates each of those four terms, HHP has refused to separately construe them, as doing so would expose its wholesale attempt to remove them from the claims.  Instead, HHP insists that it will only construe the Selectively Capturing Limitation "as a whole."  *Supra* at 30.

For each of these four terms, Amazon explains the proper construction, what that construction contributed to Amazon's overall construction of the "Selectively Capturing Limitation," and the manner in which HHP is attempting to remove it from the claims.

### 1.  Selectively

The claim term "selectively" is the adverb variant of the term "selective."  The plain and ordinary meaning of the term "selective" is "discriminating."  Soofian Decl. Ex. 4, The American

---

[26] Each constituent term has the same meaning in claim 22.  However, because the "selectively capturing" requirement in claim 22 is part of a means-plus-function claim limitation, it is also addressed separately in Section 12 below.

Heritage Dictionary 1635 (3d ed. 1992).[27]  "Discriminating," in turn, means "able to recognize the difference between things that are of good quality and those that are not."  Soofian Decl. Ex. 5, Merriam-Webster's Advanced Learner's English Dictionary 475 (2008).  Thus, the limitation "***selectively*** capturing and storing an instantaneous image" requires that, in some way, "an instantaneous image" be chosen for capture and storage based on the quality of the image.

The only type of discriminating disclosed in the specification is user (human) discrimination based on the quality of the displayed image.  5:9-27.  A user looks at the video on the monitor, and when the image of the target looks good, he takes his picture — exactly the way people take pictures with digital cameras.  According to the specification, this is true irrespective of whether the user chooses to use a keyboard key, a mouse button or a timer to initiate the capture operation: "*Regardless of the mode selected*, the user aims the image sensor 16 at the object T until a resolved image is displayed in the monitor 30," after which the user initiates a capture.  5:20-27.  HHP itself admits that "[w]hat is important and how the patent defines this limitation is based on the quality/condition of the image . . ."  *Supra* at 31-32.  When a patentee makes such clear statements regarding what he regards as the invention, without qualification to a preferred embodiment, those statements limit the scope of the claims.  *See Microsoft Corp. v. Multi-Tech Systems, Inc.*, 357 F.3d 1340, 1348 (Fed. Cir. 2004).  Moreover, because human selectivity based on the quality of the displayed image is the only type of "selectivity" disclosed,

---

[27] HHP errs in relying on a dictionary definition of the word "selection."  *Supra* at 32.  The claims of the '088 patent use the word "selectively," not "selection."  The terms are not synonymous.

if "selectively" is not construed to require both (i) human selectivity;[28] and (ii) that the selectivity

criteria be based on the quality of the displayed image, then the claims will be invalid for failure

to satisfy the written description requirement.[29]   The contribution of Amazon's "selectivity"

construction to Amazon's construction of the Selectively Capturing Limitation as a whole, is

highlighted as follows: "at an instant in time *selected by the user based on the displayed image*,

converting the live analog video signal into a single digital frame that is output for storage into

computer memory."

Notwithstanding its admission that "[w]hat is important" to the selectivity process in the

specification is the "quality/condition of the image," HHP seemingly proposes that the term

"selectively" be construed to mean "designating . . . based on one or more conditions." *Supra* at

30.  Satisfying "conditions" is not the same as "selectivity" ("discriminating"), because

"conditions" can be satisfied irrespective of the quality of the displayed images.  For example, if

a system employed the "condition" that an image will be "designated" every 20 seconds, such

designation would satisfy HHP's construction, but it does not qualify as "selective" designation.

---

[28] It is beyond legitimate dispute that the inventors intended to incorporate actions performed by humans into the claims, as claim 1 requires "aiming an imaging apparatus at a target of interest. . . ." 10:24.  It is obviously a human that must aim a camera at the target.

[29] To satisfy the written description requirement, the patent specification must "set forth enough detail to allow a person of ordinary skill in the art to understand what is claimed and to recognize that the inventor invented what is claimed."  *Univ. of Rochester v. G.D. Searle & Co.*, 358 F.3d 916, 928 (Fed. Cir. 2004).  The disclosure of a species (e.g., user selectivity based on the displayed image) is not sufficient written description of a genus (*e.g.*, all selectivity), unless the specification is clear that the invention applies to the genus as a whole.  *In re Wilder*, 736 F.2d 1516, 1520-21 (Fed. Cir. 1984) (disclosure of synchronous scanning is not sufficient written description of claim to generic scanning without a synchronous requirement).  "Adequate description of the invention guards against the inventor's overreaching by insisting that he recount his invention in such detail that his future claims can be determined to be encompassed within his original creation."  *Vas-Cath, Inc. v. Mahurkar*, 935 F.2d 1555, 1561 (Fed. Cir. 1991) (internal quotation omitted).

Harvard Law School is selective because it discriminates between applicants based on their quality.  If Harvard Law School simply accepted every 20th applicant that applied without considering their grades, SAT scores etc., no one would describe Harvard Law School as selective.  HHP is trying to read the "selectively" requirement right out of the claims.

HHP also contends that a user need not be involved in selectively capturing because the specification refers to automatic "capture and decode."  *Supra* at 30-31.  However, what the specification means by "automatic," in these passages, is that no human intervention is required *after the user initiates capture* in order to decode the barcodes — in other words, because of the invention, the user no longer has to manually load the picture into the barcode scanning program after the user takes the picture.  2:29-36; 3:10-18.  This is clear from the passages HHP itself relies on: "the user must elect the capture of a snapshot using the Hotkey, F10 . . . Upon depression of the hotkey, the processor 22 proceeds *automatically* to blocks 130 and 135, which call for the capture and attempt to decode an instantaneous image . . ." 5:16-27 (emphasis added).  "The present process allows a real-time video image to be repeatedly and selectively captured to allow automatic decoding and outputting of encoded information.  *Furthermore, the user can conveniently aim, capture and decode in a single operation*." 3:21-25 (emphasis added).

The bottom line is, the only type of selection disclosed in the specification is user selection made with a keyboard, a mouse or a timer.  HHP does not identify any others in its opening brief.[30]  And the only type of selectivity criteria identified in the specification is the quality of the displayed image, and HHP admits that the specification describes this criteria as

---

[30] HHP suggests that there are others because the specification refers to "Keyboard, Mouse, Timer, *etc.*"  *Supra* at 31.  The specification does not disclose what the "Etc." means, but if anything, it should be understood to contemplate other user inputs.

"important."  *Supra* at 31-32.  HHP's exclusion of the user from its construction excludes the

only way discrimination based on the quality of the displayed image could possibly be exercised,

and its substitution of "conditions" for "selectively" eliminates any requirement that any

selective decisions be made at all.[31]  HHP's construction of "selectively" must be rejected.

For all of the above reasons, both aspects of Amazon's construction of "selectively"

should be adopted: (i) user selection based on (ii) the quality of the displayed image.

## 2.  "capturing"

"Capture" has a plain meaning in the art.  As Dr. Bajaj explains, the plain meaning of

"capture" is conversion of analog video into digital format.  *See* Bajaj Decl. ¶¶ 11-13 and 29-32;

*see also* Bajaj Ex. 3 at 75, 495, (*defining* "capture card" as "[a]n expansion board that converts

analog video signals to digital form and stores them in a computer's hard disk or other mass

storage device").  Because the '088 patent claims require that only "an instantaneous image"

(*i.e.*, "snapshot") be captured, the construction of "capturing" incorporated into Amazon's

construction of the Selectively Capturing Limitation — "at an instant in time selected by the user

based on the displayed image, ***converting the live analog video signal into a single digital frame***

that is output for storage into computer memory" — is the plain meaning of "capturing."[32]

This plain meaning construction of "capturing" is exactly how capturing is described in

the specification.  The '088 patent describes the capture card receiving "analog electrical signals"

---

[31] As explained in Section 12 below, all of the "conditions" identified by HHP, such as the condition "that the image is properly placed in the field of view" *supra* at 31, require human judgment as to whether or when the condition is satisfied.

[32] As Dr. Bajaj explains, "video capture cards" were commonly used in the early 1990s by those who wanted to perform computer operations on video.  Most video at the time was analog, and because computers can only operate on digital information, capture cards were used to do the analog-digital conversion that was required.  Bajaj Decl. ¶ 29-32.

from sensor 14.  4:62-66.  When a user presses a Hotkey, or otherwise chooses the instantaneous image to be captured, an "instantaneous digital signal" (a "snapshot") generated by the capture card from the analog video input is output for storage into RAM.  4:44-54; 5:15-29.  Thus, the patentees used a term of art, "capturing," in their claims, they used the term in their specification in a manner that comports exactly with the plain meaning, and that is the way "capturing" should be construed.

HHP complains that Amazon's construction of "capturing" is based on the "red wire analog cable" discussed in Section 4(i)(b) above.  *Supra* at 33.  However, that red wire has nothing to do with Amazon's construction of "capturing."  The red wire was used to show that the monitor receives analog video and that in the preferred embodiment, the analog video is sent *from* the capture card *to* the video monitor.  In contrast, Amazon's construction of "capture" relates to the analog video *received by* the capture card and the single *digital frame* that is captured in response to a user's capture request.  Thus, while Amazon's explanation of the "red wire" was correct, it is irrelevant to the "capturing" construction.

For its part, HHP refuses to separately construe "capturing."  It appears, based on its construction of the Selectively Capturing Limitation "as a whole," however, that HHP's construction of "capturing" is "designating . . . for attempted decoding."  HHP's construction ignores both the plain meaning of "capture" and the manner in which "capture" is used in the specification, and is unsupported by any intrinsic or extrinsic evidence.  This is just another attempt by HHP to erase a limitation from the claims.

Capturing has nothing to do with barcode decoding, and capture cards are not capable of performing barcode decoding.  Bajaj Decl. ¶ 32.  It is true that in the specification, *after* capture occurs and *after* the captured digital frame is stored, barcode decoding is performed on the stored

image.  But anything could have been done with the frame at that point, it would not have changed the fact that capture had already been completed.  HHP's construction of "capturing" to mean "designating . . . for attempted decoding" is analogous to construing "capturing" to mean "designating for performing tricks" if a specification discloses capturing a wild dolphin from the ocean and then putting that dolphin in a show at Sea World.

### 3.  "an instantaneous image"

The specification defines "an instantaneous image" to mean a "snapshot"(*see* 4:51-54; 5:9-15; 5:22-27), which even laypersons know is a picture taken at one instant in time.  Because the claims require that the "instantaneous image" be "captured," it must be digital (*i.e.*, a digital frame).  The construction of "an instantaneous image," incorporated into Amazon's construction of the Selectively Capturing Limitation, thus comports with its plain meaning: "***at an instant in time*** selected by the user based on the displayed image, converting the live analog video signal into ***a single digital frame*** that is output for storage into computer memory."

This is exactly what "an instantaneous image" means in the specification.  The snapshot is captured at the instant in time that the user presses the hotkey, the instant in time that the user clicks on a mouse button, or the instant in time the user identifies when setting the timer ("e.g., 2 seconds").  4:51-54.  That snapshot is an "instantaneous *digital* signal . . ."  5:22-27.  Thus, the specification also supports Amazon's construction.

HHP construes "an instantaneous image" to mean "a real-time image."  That construction is incorrect.  "Real-time image" is a *different* term used in the claims to refer to video.  10:27; 12:17-18.  In contrast, "an instantaneous image" is a snapshot, not video.  HHP's attempt to change "instantaneous image" into the different claim term "real-time image" in order to remove the "snapshot" limitation from the claims must be rejected.

### 4. "storing"

Amazon incorporates by reference its arguments in Section 5(ii), *infra*.

### iii.   Hand Held's Reply Position

#### a. "selectively capturing and storing an instantaneous image of said target into the memory of a computer" (Claim 1)

Amazon has chosen not to specifically respond to Hand Held's proposed construction, which construes the limitation as a whole.  Rather, Amazon chose to parse the limitation into its constituent elements.  As discussed in detail below, Amazon's proposals would lead to an unwieldy construction while ignoring the context of the remainder of the claim limitation. Moreover, Amazon's proposals would limit the claim by defining "who" performs this step, rather than what the claim term means, contrary to explicit disclosures in the patent.

A detailed understanding of how the main program of the preferred embodiment operates provides support for Hand Held's construction as shown in Figure 2, the program begins with blocks 105 and 110 which activate the program and load various software variables.  At blocks 115 and 120, the continuous video image is displayed on the screen.  In doing so, the frame grabber 18, also referred to as a video capture card, converts every image into digital form, 4:64-5:2, and then sends it to the monitor 30.  But this operation is not the "selectively capturing and storing an instantaneous image…." recited in the claim.  The "selectively capturing and storing an instantaneous image…" is performed at block 125 – *after* the frame grabber has "captured" all of the images and digitized them.  Fig.  2; 5:9-10; Wolfe Decl ¶¶29-30.  Specifically, as the digital images flow to the monitor, an image is designated and placed into memory in boxes 125 and 130.  Taavola Decl Exs. H at 80-81, I at 113-14; Wolfe Decl ¶30.  This selective capturing can be trigged by the user, programming or other processor, but results in sending a signal to the processor to perform the selective capture.  4:44-54; 2:53-56.  *See* generally, Claims 3 – 6.

41

During prosecution, in response to a rejection, the patentee made it clear that the purpose of selectively capturing the image was for attempted decoding.  JCC Ex. D at 9.

By dissecting the phrase into its separate words, Amazon tries to limit its scope in ways which contravene one of the primary objects of the invention: namely, to provide a system which can automatically and without human intervention capture and decode "a video input" and do so "repeatedly." 2:53-55; 3:22-24.

> **b.  "selectively capturing…an instantaneous image" (Claim 1) / "selectively capturing at least one image displayed by said display means" (Claim 22)**

Amazon asks the Court to construe four terms separately ("selectively," "capturing," "instantaneous image," and "storing").  Hand Held does not believe that these terms should be construed as parsed by Amazon, because they strip the words of their context within the claim element.  *See* Section 4(iii)(a), *supra*.

### 1.  Selectively

With respect to "selectively," Amazon's construction is that the image is "selected by the user based on the displayed image." *Supra* at 36.  Yet, this does not answer the question Amazon has been raising from the start of the case – what does "selectively" mean? Amazon proposes no actual construction of this word, instead offering what amounts to a tautology based not upon a definition of the term, but a characterization of "who" performs the step.[33] This does not advance an understanding of the issue on which Amazon claimed such great confusion.

---

[33] Although Amazon defines "selective" as "discriminating," it does not argue that any of these definitions should be part of its proposed constructions.  *Supra* at 34-35 (citing The American Heritage Dictionary 1635 (3d Ed. 1992)).  Amazon further defined "discriminating" based on a different dictionary from 2008.

While Amazon acknowledges the disclosures in the patent relating to an automatic mode, it incorrectly defines automatic to mean "after the user initiates the capture." *Supra* at 37.  This is in direct conflict with the specification.  The specification states that one of the primary objects of the invention is to "provide a system which automatically and without human intervention capture and decode." 2:53-57; see also 3:21-25.  "Automatically and without human intervention" could not be clearer at all.  Moreover, the patent expressly states that the "snapshot can be taken automatically by the processor." This is not a user-initiated capture.  Amazon's construction must fail because it reads out an expressly disclosed alternative embodiment that serves a primary object of the invention.  *See also*, Taavola Decl. Exs. H at 111, I at 120-22.  It is also contrary to the doctrine of claim differentiation in that claims 3-5, which depend from claim 1, all recite that the selective capture is performed by "input means linked to the imaging apparatus," such as the mouse or keyboard.  This supports the conclusion that selective capturing as claimed in claim 1 includes automatic capturing not dependent on such inputs.

Amazon next makes a written description argument, claiming that there is no discussion about what conditions could be used by the processor to make the selective capturing decision.  Amazon is wrong.  The patent discloses that the processor can be programmed to take a snapshot based on predetermined time intervals.  4:51-54.  Certainly, satisfying a periodic time delay is satisfying a condition.  Furthermore, Claim 6 recognizes that the selective capturing could be done by sending signals from a host device.  And certainly, even Amazon would agree that in the case of a user-initiated key strike or mouse click, the processor is still responding to an electronic signal which it recognizes as an instruction to begin the capture.  Such signaling is a simple algorithmic step that satisfies any concern about written description.  *Finisar Corp. v. DirecTV*

*Group, Inc.*, 523 F.3d 1323, 1340 (Fed. Cir. 2008); Taavola Decl. Ex H at 111.  Amazon's expert certainly did not opine to the contrary.

Amazon faults Hand Held's construction on the grounds that only certain examples of selective capturing are identified in the specification.  Yet a patentee need not define every example or embodiment to satisfy a written description requirement, and claims should not be limited to disclosed examples absent clear disclaimer.  *Rexnord Corp. v. The Laitram Corp.*, 274 F.3d 1336, 1344 (Fed. Cir. 2001).  Here, Amazon has pointed to no such disclaimer, and, given the patent's discussion about the desirability of not of not wanting to attempt decoding until the image is properly resolved, it is well within the scope of the disclosure to design the system such that the signal depends upon some condition regarding image resolution.  Certainly the inventors testified about such other types of modes that would be known to one of ordinary skill in the art and indicated in their invention could include a large number of possible conditions on which to send the signal.  Taavola Decl. Exs. H at 111, I at 127-28.

## 2.  Capturing

Amazon's proposed construction for capturing – "converting the live analog video signal into a single digital frame" – is not the "selective capturing" in the claim limitation.  Amazon is pointing to the wrong operation, describing what is taking place at the video capture card – frame grabber 18.  The parties agree that the frame grabber 18 captures every frame and converts it into digital form.  But this is not the selective capturing described in the patent.  Wolfe Decl., ¶¶29-30.  Frame grabber 18 sends every digitized image to common bus 28, not to the fictitious red cable.  Figure 1.; Taavola Decl. Exs. H at 70-72, I at 112-13.  This operation by the frame grabber 18 is not called a "capture" in the key passages and certainly occurs before any "selective capture." Figure 2; Taavola Decl. Exs. H at 80, I at 113-14.  The "selective capturing"

is designating a digital image from a stream of video already converted by the frame grabber. Taavola Decl. Exs. H at 80-81, I at 114-15; Wolfe Decl. at ¶ 30.

In addition, Amazon's focus on the video capture card / frame grabber would divorce the construction of selectively capturing from the concept of decoding.  Frame grabber / capture cards are not capable of performing decoding.  Yet "selectively capturing" is performed to effectuate barcode decoding; *i.e.*, the reason the image is being selectively captured is for decoding.  Taavola Decl. Exs. H at 84, I at 114-15.

### 3.  "an instantaneous image"

The specification refers to "instantaneous image" as a "snapshot." 4:51-54.  Since the snapshot is taken from a real-time video, a snapshot is simply a real-time image.  Amazon's focus on a single digital frame is misplaced.  The passage in question does not talk about capturing frames; it describes selectively capturing images.  The patent states that the snapshot is "an instantaneous image of the signal, (referred to hereafter as a 'snapshot,') referring to an instantaneous digital signal which is stored into RAM." 5:22-27.  The patentee's use of the word image, instead of frame, makes sense in view of the preferred embodiment.  For example, when the mode is set for the user to press a "Hot Key" to capture the image, the user does not know what frame it is captured.  The user only knows that it is the image on the screen, not whether it is frame 1, frame 7 or frame 42.  Since video is a series of frames, it is highly likely that the frame displayed on the screen is not the frame that is captured when the Hot Key is pressed. Taavola Decl. Exs. H at 80, I at 113-14.  But that does not matter, since what the user wants to capture is an image.  The same is true if the processor selectively captures the image.  In the timer example, the processor is not identifying frame 1, frame 7 or frame 42.  The processor is capturing an image every 2 seconds.

In addition, Amazon has no basis for objecting to Hand Held's proposal that the image is a "real time" image.  That is exactly what the patent is about, from its title ("Decoding a Real Time Video Image") to the Summary of the Invention ("The present process allows a real time video image to be repeatedly and selectively captured." 3:14-16).  Stripping the concept of "real time" from the decoding does violence to the disclosure as a whole.

### iv.  Amazon's Sur-Reply Position (for both of HHP sections "a" and "b" above)

HHP does not dispute that the plain meaning of "selective" is "able to recognize the difference between things that are of good quality and those that are not."  And HHP does not dispute that the plain meaning of "capture" in the video arts is "analog to digital conversion."  Thus, pursuant to the plain meaning of its words, this limitation requires choosing a single image to convert from analog into digital based on the quality of the image, and storing that image after it is converted.  HHP does not like this plain meaning, so it continues to insist that it is entitled to ignore the actual words of the claim and to instead construe the limitation "as a whole."  By so doing, HHP is able to conclude that nothing whatsoever has to be chosen in a selective way, and that the analog to digital conversion performed by the disclosed "video *capture* card" has nothing to do with the claimed "capturing."

### 1.  "selectively"

HHP contends that Amazon's plain meaning construction of "selectively" is not incorporated into its construction of the Selectively Capturing Limitation and that Amazon *instead* focuses on the user.  *Supra* at 42.  HHP is wrong, because the two go together.  As we previously explained, both parties agree that what must be chosen "selectively" is a displayed image, yet the only disclosure of how a displayed image can be chosen based on its quality is by exercise of human judgment based on looking at the displayed images — the type of selectivity

humans employ all the time when they take pictures. *Supra* at 35. That is Amazon's construction. Although HHP contends that a system could be built to automatically assess the quality of a displayed image, *supra* at 43, HHP's inventor admitted that such a system is not disclosed in the specification. Soofian Decl. Ex. 8, 114:1-116:7. That is why the claims are invalid for failure to satisfy the written description requirement if they do not require ***user*** selectivity based on the quality of the displayed image.

HHP again argues that a user is not required because the specification discloses automatic "capture and decode," *supra* at 43, but it ignores Amazon's previous explanation that this automation occurs ***after*** the user selectively chooses which image to capture by pressing a key, clicking a mouse or setting a timer.[34] It is "automated" because a human need not manually load the captured picture into a barcode decoding program. *Supra* at 36-37.

Finally, HHP's reliance on the doctrine of claim differentiation is misplaced. *Supra* at 43. Dependent claims 3-5 are directed to "input *means*" which under 35 U.S.C. § 112 refers to the specific structures disclosed. In contrast, claim 1 is broad enough to cover other structures a user can employ to convey which image he has selectively chosen for capture and storage.

### 2. "capturing"

There is no dispute that the plain meaning of "capture" in the video arts is analog to digital conversion and output for storage into a computer. *Supra* at 38. Nor is there any dispute that the specification discloses a device called a "video ***capture*** card" which performs analog to digital conversion. Yet, according to HHP, neither analog to digital conversion nor the disclosed "video ***capture*** card," have anything to do with what "capturing" means in the claims. The

---

[34] HHP's inventor admitted that the timed interval, if used, is "set by the user." Soofian Decl. Ex. 8, 99:10-13, 114:24-115:6, 144:18-23.

reason this must be true, according to HHP, is that the "video *capture* card" captures (*i.e.*, converts) *every* frame, which is not "selective" as the claims require.  Therefore, HHP's logic goes, because what is claimed is not what is disclosed, the claim should be rewritten to match the disclosure — "capture" should not be given its plain meaning, it should not be given the meaning the word "capture" has in the specification, and it should instead be rewritten to mean "designating . . . for attempted decoding."  *Supra* at 44-45.  Even if HHP was correct about the way the disclosed "video *capture* card" operates, there is no doctrine of claim construction which permits changing the meaning that a claim term has in both the art and the specification simply because the patentee chose to claim something that is not disclosed.  For that reason alone, HHP's construction must be rejected and Amazon's adopted.

In the event the Court wishes to get into the weeds on video capture card operation, however, Dr. Bajaj explains that the capture card referenced in the patent (like the later model by the same manufacturer) performs two different functions.  Bajaj Decl. ¶¶ 22-42; Second Bajaj Decl. ¶¶ 4, 15-2).[35]  First, it can supply the live video from the camera to the computer monitor. Second, it can receive a command and, in response, output a single digital frame (which it converts into digital from its analog input) for storage and subsequent processing.  That is why the "video *capture* card" is also called a "frame grabber" in the specification and in the art — because it can capture one specific frame.  Bajaj Decl. ¶ 29; Second Bajaj Decl. ¶¶ 18-21.  And that is why HHP is wrong when it alleges that only step 120 in '088 Figure 2 relates to the operation of the "video capture card" but not step 130.  Step 120 relates to the card's first function, and step 130 relates to its second function.

---

[35]  HHP's inventor confirmed all of Dr. Bajaj's explanations of how the FlashPoint Lite 128 card functions.  Soofian Decl. Ex. 8, 87:14-88:4, 91:20-92:22, 95:1-10, 127:9-128:3, 129:24-130:17.

### 3.  "an instantaneous image"

"An instantaneous image" is defined in the specification as a "snapshot," which has a plain meaning as a single image.  Soofian Decl. Ex. 6, Am. Heritage 1705.  Similarly, the disclosed "video capture card" that captures an instantaneous image is referred to synonymously in the specification and in the art as a "*frame* grabber."  "Frame" also has a plain meaning as a single image.  *Id*. at 720.  Consistent with this disclosure and these plain meanings, Amazon construes "an instantaneous image" to mean a single digital frame (it is digital because it was "captured").

As Amazon previously explained, HHP's construction — "real time image" — already appears elsewhere in the claim to refer to video, not to a "snapshot."  *Supra* at 40.  HHP does not dispute this.  It does not dispute that under its construction, "an instantaneous image" would cover video.  HHP provides no justification for rewriting the claim in this manner.

### 4.  "storing"

Amazon incorporates by reference its arguments in Section 5(iv), *infra*.

## 5)    "Storing" (Claim 1)

| Hand Held's Proposed Construction | Amazon's Proposed Construction |
|---|---|
| The term shall be construed as part of the limitation as a whole within the context of the claim, rather the separately. | Retaining data at a location from which it can be copied at a later time |

### i.    Hand Held's Opening Position

As with the term "selectively capturing…an instantaneous image," Amazon's construction of "storing" is improper.  By separating the "selectively capturing and storing an instantaneous image of said target into the memory of a computer" limitation into its constituent elements, Amazon's construction places the term out of context.  *See* Section 4(i)(a), *supra*.  During the parties' meet and confer, Amazon provided no explanation as to why "storing" should

49

be construed separately.  As described in detail above, "capturing" and "storing" are intertwined.

*Id.*  Construing "storing" separate and apart from the entire claim language will lead to confusion

and is contrary to the disclosures in the patent and the prosecution history.  Incorporating

Amazon's proposed constructions into the claim limitation as a whole leads to another unwieldy

and confusing construction:

| Claim 1 Element | Claim 1 Element Incorporating Amazon's Proposed Constructions for "selectively capturing…an instantaneous image" and "storing" |
|---|---|
| selectively capturing and storing an instantaneous image of said target into the memory of a computer | At an instant in time selected by the user based on the displayed image, converting the live analog video signal into a single digital frame that is output for storage into computer memory retaining data at a location from which it can be copied at a later time of said target into the memory of a computer. |

### ii.      Amazon's Answering Position

The Selectively Capturing Limitation requires that the captured image be stored.  That

storage must be in a storage location from which it can be later copied for further processing if

necessary, because the ability to do such further processing of video frames in a computer is the

reason capture cards were developed.  Bajaj Decl. ¶¶ 7-13 and 3.  Therefore, that is Amazon's

construction of "storing."  The specification confirms this construction: Figure 2 shows in step

130 that the captured digital frame is stored in RAM, and in step 150 the user copies that file

onto a hard disk.  5:31-42.

### iii.      Hand Held's Reply Position

Amazon's construction of "storing" is based upon its misreading of the term "capturing."

Amazon proposed construction is based on the operation of the video capture card (frame

grabber 18) and it placing a frame into RAM.  As described in detail above, the "capturing" done

by frame grabber 18 is not the selectively capturing claimed in this limitation.  As described in

detail in Hand Held's opening position, the specification and the prosecution history demonstrate

that capturing and storing are intertwined.  After the image is identified, or "captured" the image is placed into memory for decoding or "stored." 5:9-15.  While distinct conceptually, the terms are essentially two sides of the proverbial same coin.  For example, during prosecution, the patentee explained that the prior art Baumberger reference distinguished "capturing" in the prior art reference was different because it did not take the next step of placing the image into memory for any further processing.  JCC Ex. D at 9.  Thus, capturing and storing are two steps related to designating for further operations.

Amazon's reliance on Block 150 in Figure 2 is misplaced.  Block 150 is not part of the selectively capturing and storing limitation.  Block 150 relates to dependent claim 13, which adds the additional step of saving images that were unable to be decoded to the hard disk.  5:41-42.  These images are not saved for further decode operations.

iv.     **Amazon's Sur-Reply Position**

HHP argues that Amazon's construction of "storing" stands or falls with its interpretation of "capturing."  *Supra* at 50-51.  Amazon agrees that the two go together.

6)    **"bar-coded information"(Claims 1, 22, 23) / "bar-code readable information"**
      **(Claim 1)**

| Hand Held's Proposed Construction | Amazon's Proposed Construction |
|---|---|
| For "bar-coded information:" Information reflected in symbologies/codes according to one or several known and/or published standards, including but not limited to UPC, EAN, Code 49, PDF 417, Code 93, Vericode, Aztec, Code One, Data Matrix, Maxicode, Codabar, Interleaved 2 of 5, etc. | For "bar-coded information:" Indefinite |
| For "bar-code readable information:" The term shall be construed as part of the limitation as a whole within the context of the claim, rather the separately. | For "bar-code readable information:" Indefinite |

    i.   **Hand Held's Opening Position**

   Amazon's contention that the terms "bar-coded information" and "bar-code readable information" are indefinite is also unfounded.  The terms "bar-coded information" and "bar-code readable information" are used in the patent over 20 times.  Despite its numerous hearings regarding the "selectively capturing" limitation, Amazon never claimed it did not understand bar-coded information or bar-code readable information.  Moreover, at the Technology Tutorial, Amazon planned to present a slide entitled "Bar Code Decoding Is Prior Art" that cited a passage in specification that states "bar code readers are also known for reading 1D and 2D bar code symbols, such as *bar coded information* in supermarkets, etc." Taavola Decl. Ex. B, slide 4, citing 1:26-28 (emphasis added).  Counsel for Amazon did not show this slide because "it shows pretty much what I just described and also what Mr. Woods explained.  *I don't think there's disagreement in this area.*" Taavola Decl. Ex. A, 37:4-8 (emphasis added); s*ee also,* 7:3-13:3.  Yet, despite telling the Court that there is no disagreement between Amazon and Hand Held regarding barcodes and decoding barcodes, Amazon now claims that these terms are indefinite.

   The term "bar-coded information" is information reflected in symbologies/codes according to one or several known and/or published standards, including but not limited to UPC,

EAN, Code 49, PDF 417, Code 93, Vericode, Aztec, Code One, Data Matrix, Maxicode, Codabar, Interleaved 2 of 5, etc.  As Amazon acknowledged during the Technology Tutorial, the specification recognizes that bar-codes and decoding algorithms were well known in the art.  In fact, while claiming it is indefinite, Amazon finds intrinsic evidence to support a construction.  D.I. 152, Chart, #6.  The specification goes further to exemplify some specific symbologies / codes and incorporates a detailed discussion of those codes.  *See* Figs. 6-9; 1:26-62 (citing among other things, U.S. Patent Nos. 4,794,239; 5,340,786 (sic 5,304,786); U.S. Ser. No. 08/504,643 (now U.S. 5,773,806), 08/516,185, 08/697,914 (now U.S. 5,932,862)); 8:66- 9:41, (citing among other things U.S. Ser. No. 08/504,643 (now U.S. 5,773,806), 8/441,446 (now U.S. 5,591,956).

Moreover, during prosecution, the patentee amended claim 1 to include the term "bar-coded information" to specific limitation.  *See* JCC Ex. D at  4, ll. 9-13; *compare* ll. 4.  In addition, the patentee added apparatus claims 22 and 23 which include the term "bar-coded information."  *Id. at* p. 3.  The Examiner allowed the amendments and the added claims without a rejection.  The Examiner stated that the prior art "fail[ed] to show or fairly suggest an apparatus for…decoding bar-code information." JCC Ex. E at 2.  Given this overwhelming intrinsic evidence, Amazon cannot clearly and convincingly show that the term is indefinite.

The term "bar-code readable information" is definite and should be given its plain and ordinary meaning – readable bar-code information.

### ii.     Amazon's Answering Position

Claim 1 requires two discrete steps: (1) "determining if bar-coded information is present in said stored image"; and (2) "decoding bar-code information if bar-code readable information is contained on said instantaneous stored image . . ."  The "determining" step was added during prosecution.  JCC Ex. D at pg. 4.

These steps are indefinite for a whole host of reasons.  For example, is the second step of "decoding bar-code information" performed if "bar code-readable information" is on the object, or is its performance somehow based on the outcome of the first "determining" step?  If it is not based on the performance of the "determining" step, then why is the determining step performed at all?  Does the "determining" step relate in any way to the "bar-code readable information" referenced in the second step?  And what is the difference between "bar-code information" and "bar-code readable information," since bar codes are by definition readable?  *See* Section 2 above.  Neither the specification nor the claim provides any answers.  The claim is therefore indefinite.

Even if these steps are somehow construed to mean that (i) the first step requires determining if there are barcode symbols in the picture; and (ii) the second step requires decoding those bar-code symbols if they were determined to exist in the first step, these steps would still be indefinite.  According to the specification, the only way to determine if something is a bar code symbol or not is to try to decode it — if decoding is successful, then it is a barcode.  *See* 6:29-31 ("Whether or not they are barcode symbols is determined on the basis of whether they are decodable.")  What this means, however, is that if it is determined in the first step that barcode symbols exist, then they, by definition, have already been decoded.  There would be nothing left to decode in the second step.  The second step would therefore still be indefinite.

HHP asserts that "bar-coded information" is "information reflected in symbologies/codes according to one or several known and/or published standards" (*supra* at 52), while "bar-code readable information" is simply "readable bar-code information" (*supra* at 53).  Not only does this fail to resolve any of the questions posed above, but it raises additional questions as well.

For example, how can "bar-coded information" conform to a published standard if it is not readable?

### iii.  Hand Held's Reply Position

Amazon does not directly respond the Hand Held's arguments on these terms.  Rather Amazon only references these terms in its arguments regarding the disputed term "decoding barcode information if bar-code readable information is contained on said instantaneous stored image." Amazon has not and cannot meet its high burden to show that the claims terms are indefinite.  Amazon presented no expert evidence to support its view that the claims are insolubly ambiguous.  Amazon's arguments are based solely on attorney argument.  This is insufficient to support a finding of indefiniteness.  *Takeda Pharm. Co. v. Zydus Pharms. USA, Inc*., 109 U.S.P.Q.2d 1825, 1830 (Fed. Cir. 2014).

"Bar-coded information" is "information reflected in symbologies/codes according to one or several known and/or published standards" and "bar-code readable information" is simply "readable bar-code information." Despite these constructions, Amazon asserts that the terms are indefinite, not based on any evidence, but rather based on the single question – "[H]ow can 'bar-coded information' conform to a published standard if it is not readable?"

The answer to this question is readily apparent to one skilled in the art and explicitly answered in the intrinsic evidence.  As described in Allais, which is cited on the face of the patent and referenced in the specification, practical limitations, such as the limitations of a given printing process or minor physical damage to the bar code, could make a barcode unreadable. Taavola Decl. Ex. E 1:25-35; *see also* Wolfe Decl. ¶ 31.  Hand Held explained during the prosecution that the information at issue not only had to be bar coded but had to be able to be read in order to be decoded.  JCC Ex. D at 8, ¶2.

### iv.      Amazon's Sur-Reply Position

HHP argues that "bar-coded information" and "bar-code readable information" are distinguishable (and therefore not indefinite), because the latter is a readable barcode symbol and the former is a barcode symbol that need not be readable.  As an initial matter, HHP provides no basis to assume that "bar-cod**ed** information" means a bar code symbol.  Because the claims distinguish "bar-cod**ed** information" from "bar-cod**e** information," perhaps the latter means "barcode symbol" and "bar-cod**ed** information" means information encod**ed** by barcode encoding (the information one obtains by decoding a barcode symbol).  Because there is no way to know what "bar-coded information" means, it is indefinite.

Even if "bar-coded information" did mean "bar code symbol," such symbols are by definition readable.  *Supra* at 19.  This plain meaning is confirmed by the specification itself: "[w]hether or not they are bar code symbols is determined on the basis of whether they are decodable."  6:29-31.  If, as HHP says, a problem with the printing process makes it unreadable, then it will not conform with the barcode standards HHP cites and it is not a barcode symbol. For example, if a problem with the printing process makes the letter "E" look like the letter "F" on a piece of paper, then it simply is not the letter "E" irrespective of what the intent was.  This limitation is therefore also indefinite because there is no way to give both "bar-coded information" and "bar-code readable information" definite and discrete meanings.

Next, HHP argues that "[d]etermining the presence of bar-code information and decoding that bar-code information are concurrent steps."  However, the specification does not disclose them as separate steps, either concurrent or sequential.  It discloses *one* step, decoding, which accomplishes both "determining" and "decoding."  *Supra* at 54.  Decoding is done to decode,

and as HHP admits, decoding is done to determine "[w]hether or not there are any barcode symbols . . ."  6:29-31; *infra* at 59.[36]  Thus, although HHP admits that the "determining" step was added during prosecution to overcome prior art (*infra* at 59), there is no way to give it a definite meaning as a separate step from the "decoding" step.

**7)      "decoding bar-code information if bar-code readable information is contained on said instantaneous stored image" (Claim 1)**

| Hand Held's Proposed Construction | Amazon's Proposed Construction |
|---|---|
| No construction required – plain and ordinary meaning.<br><br>Alternatively, if barcode information that can be read is contained on the instantaneous stored image, then it will be decoded. | Indefinite |

**i.      Hand Held's Opening Position**

Amazon also incorrectly argues that this term is indefinite.  During the parties' meet and confer, Amazon did not explain its basis for making such an assertion, and again it is inconsistent with Amazon's prior conduct in the case.  For example, in the Technology Tutorial, Amazon told the Court that bar coding is prior art and agreed with Hand Held that bar code decoding algorithms were known in the prior art.  *See,* Taavola Exs. B, slide 4; A, 37:4-8; 7:3-13:3; 35:15-17.  As demonstrated with the term "bar-coded information" the specification contains more than ample support for this term.  Moreover, during prosecution, the patentee distinguished the cited art by stating that "it does not appear that the information of the bar code is actually <u>decoded</u> in the normal sense." JCC Ex. D at 8, ¶ 2 (emphasis in original).  The Examiner accepted that decoding can happen in the normal sense and allowed the claims.  Thus, no construction is required and the claim term should be given its plain and ordinary meaning. *Thorner,* 669 F.3d at

---

[36]  Although HHP makes up an example of how a German-English translator could comprise two concurrent steps, no such example is provided in the specification, and HHP cites to none.

1365.  In the alternative, if the Court finds that a construction would be useful, Hand Held

proposes the following construction: if barcode information that can be read is contained on the

instantaneous stored image, then it will be decoded.

### ii.      Amazon's Answering Position

Amazon incorporates by reference its arguments in Section 6(ii), *supra*.

### iii.      Hand Held's Reply Position

Amazon fails to present any evidence as to why this claim would be indefinite.  Amazon

simply posits questions based on attorney argument rather than an expert from the field of bar-

coding.  Amazon's questions focus on the interplay between the two claim limitations –

"determining if bar-coded information is present in said stored image"[37] and "decoding bar-code

information if bar-code readable information is contained on said instantaneous stored image."

Amazon's questions reveal its misunderstanding of how bar codes are decoded, and stem

from its desire to impart sequencing to the steps.  *Infra* at 78.  Determining the presence of bar-

code information and decoding that bar-code information are concurrent steps.  That is disclosed

in the patent and cited references.  Amazon does not contravene this by way of expert testimony.

This concurrence is similar to what happens when a person is confronted with a foreign

language.  For example, if a person was trying to translate the phrase "Was ist für Abendessen?",

the person might look at the first word.  Without knowing what language it is in, the person

might look at that word and determine that it could be the English word "was" or the German

word for what.  While the person is still determining the language, he/she is decoding the words.

---

[37] Amazon does not assert that the "determining" limitation as a whole is indefinite, but only that
the term "bar-coded information" is.  Thus, as demonstrated by the Joint Claim Construction
Chart, this term is not in dispute.  Based on its briefing, it is unclear if Amazon is offering a
construction for this undisputed term.  *Supra* at 54.  This will need to be clarified at the Hearing.

The person would be determining and decoding along the way, finding that umlauts are typically German.  But the person will not finally determine that the phrase is in German until he/she decodes the entire phrase to reveal the question "What is for dinner?"  As the patent recognizes, the process of determining and decoding barcodes is similar to reading a foreign language.  As the patent states that "[w]hether or not there are any barcode symbols is determined on the basis of whether they are decodable."  6:29-31.

During prosecution, the determining limitation was added to overcome prior art.  The Examiner rejected the claims based on the disclosure in Bamburger which appeared to simply match the image of a barcode.  The patentee amended the claims to clarify that the patented invention was actually decoding in the "normal sense."  JCC Ex. D at 4-5.  This involves calculating the rate of change between the portions of the captured image data and looking for possible bar code symbols in the captured data by identifying regions of high activity.  5:53-57; 6:14-19.  During this process, decoding is occurring.  7:28-36.  The decoding limitation is definite and Amazon has not and cannot identify any evidence to the contrary.

### iv.    Amazon's Sur-Reply Position

Amazon incorporates by reference its arguments in Section 6(iv), *supra.*

8) **"imaging means for imaging a target of interest, said target having at least one of optically readable and bar-coded information contained therein" (Claim 22)**

| Hand Held's Proposed Construction | Amazon's Proposed Construction |
|---|---|
| For "imaging means for imaging a target of interest, said target having at least one of optically readable and bar-coded information contained therein:"<br><br>Function: imaging a target of interest<br><br>Structure: Imaging Optics 14, Image Sensor 16, and equivalents thereof. | For "imaging means for imaging a target of interest, said target having at least one of optically readable and bar-coded information contained therein:"<br><br>A means-plus-function limitation governed by 35 U.S.C. § 112(f).<br><br>Function: imaging a target of interest, said target having at least one of optically readable and barcoded information contained therein.<br><br>Structure: Indefinite.<br><br>In the alternative, the corresponding structure would have to include at least imaging optics, an image sensor such as a CCD or CMOS and an electronic interface providing analog electrical signals to a video capture card (3:55-62, 4:3-4, 4:62-67) |

i.      **Hand Held's Opening Position**

The parties agree that this claim term is means-plus-function and is governed by U.S.C. §112(f) but propose different functions and structure. The function of the imaging means is imaging a target of interest. The remainder of the claim element, "said target having…" is not a function to be performed by the imaging means but rather a characteristic of the target. The specification states that the function of the imaging means is to image the target by receiving and focusing an image of the object onto the substrate of the image sensor. 3:58-67; 4:62-64.

The specification provides sufficient support for the structure of the imaging means. In the preferred embodiment imaging a target of interest is performed by Imaging Optics 16 and Image Sensor 14. 3:58-67; 4:62-64. While Amazon claims that the structure is indefinite, it was able to identify a corresponding structure. D.I. 152, #8. The parties are in agreement that the

structure would include imaging optics and an image sensor.  Amazon, however, wants to sweep in additional structure by adding an electrical interface.  While such structure may be useful in building a device, it is unnecessary to perform the recited function.  *See Wenger Mfg., Inc. v. Coating Mach. Sys. Inc.*, 239 F.3d 1225, 1233 (Fed. Cir. 2001) ("a court may not import…structural limitations from the written description that are unnecessary to perform the claimed function.").  An electrical interface provides analog electric signals which are not required to image the target.  Thus, the appropriate structure is the Imaging Optics 16 and Image Sensor 14 and equivalents thereof.

ii.     **Amazon's Answering Position**[38]

Pursuant to 35 U.S.C. § 112(f), "[a]n element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, *and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.*"  (Emphasis added).  Thus, if a patent applicant opts to claim an invention in means - plus - function terms, the claim is limited to the corresponding structure disclosed in the specification and to equivalents of that structure.

"A structure disclosed in the specification qualifies as 'corresponding' structure only if the specification or prosecution history clearly links or associates that structure to the function recited in the claim."  *Default Proof Credit Card Sys., Inc. v. Home Depot USA, Inc.*, 412 F.3d 1291, 1298 (Fed. Cir. 2005).  "'[A] means-plus-function clause is indefinite if a person of

---

[38] Amazon does not necessarily repeat every claim construction and indefiniteness argument in its discussion of the means-plus-function limitations that it already made with respect to corresponding terms or phrases found in method step limitations.  Nonetheless, those arguments apply with equal force when those or similar terms or phrases are found in means-plus-function limitations.

ordinary skill in the art would be unable to recognize the structure in the specification and associate it with the corresponding function in the claim.'" *Noah Sys., Inc. v. Intuit Inc.*, 675 F.3d 1302, 1312 (Fed. Cir. 2012).

The "imaging means" recited in claim 22 performs the function of "imaging a target . . . having at least one of optically readable and bar -coded information contained *therein*." The word "therein" connotes that the "information" is *inside* the target, as opposed to claim 1, where the information is *on* the target. The specification, however, does not disclose any devices that image an object having information inside of it, or that are capable of imaging any kind of information (be it a barcode symbol or anything else) that is *inside* the object that the camera is aimed at.[39] Consequently, the specification does not disclose any structure that is "clearly linked" to the claimed function of imaging a target having information inside of it, and the limitation is therefore indefinite.

HHP appears to recognize this problem, so it refuses to construe the word "therein" (again hoping that will just make the limitation disappear). *See* JCC # 9. It also expressly asks the Court to ignore the requirement that the information be "in" the target because the location of the information allegedly does not relate to the function performed by the imagining means. *Supra* at 58. HHP is obviously wrong. If the claim was directed to a method of "imagining a target having information inside of it," and the accused infringer imaged a target that did not have information inside of it, there would be no infringement. Here, this means - plus - function claim limitation identifies that function as a function the specification must "clearly link" to a

---

[39] The imagining means would somehow have to be able to image barcode symbols inside the object because, otherwise, those symbols can never be decoded.

structure.  Because the specification does not clearly link any structure to that function, it is indefinite.

If, for whatever reason, the Court were to find that this means-plus-function limitation is not indefinite, the parties agree that, at the very least, the "imaging means" must include imagining optics 16 and image sensor 14 depicted in Figure 2.  *Supra* at 60.  For some reason, however, HHP contends that the electronics necessary to provide the analog signals of the imaged video to the video capture card are not part of the imagining means.  *Id.*  There are many reasons why HHP is wrong about this, but the simplest reason is that the specification expressly says that HHP is wrong.  HHP agrees that sensor 14 is part of the imagining means, and sensor 14 includes these electronics: "[t]he imaging device 14 also includes electronics which allow interfacing with a video capture card" 4:3-4, whereby the interfacing includes sending analog signals to the capture card.  4:64-67.  Hence, the claim would have to be construed to require such electronics.

### iii.    Hand Held's Reply Position

Amazon fails to cite any intrinsic or extrinsic evidence to support its indefiniteness argument.  Rather, Amazon bases its entire indefiniteness argument on the word "therein." Amazon is claiming confusion because it reads the claim as requiring the taking of a picture of a can of corn, for example, that has a barcode *inside* the can.  Common sense dictates that what is being referred to is that the bar code is in the field of view.  *See* Section 1, *supra*.

While Amazon asserts this creative indefiniteness argument, Amazon also identifies corresponding structure.  The parties are in agreement that the structure would include imaging optics and an image sensor.  Amazon, however, wants to sweep in additional structure by adding an electrical interface.  But, the Federal Circuit has stated that "a court *may not* import… structural limitations from the written description that are unnecessary to perform the claimed

function." *See Wenger Mfg.*, 239 F.3d at 1233 (emphasis added).  Yet, that is exactly what Amazon is attempting to do.  While the specification states that the imaging device "*also includes* electronics which allow interfacing with the video card," these electronics do not perform the function – imaging a target of interest.  These electronics perform the separate function of interfacing with the frame grabber.  4:3-4.  Amazon provides no explanation as to how these electronics perform the function of "imaging."

### iv.  Amazon's Sur-Reply Position

HHP essentially concedes that this limitation is indefinite as written because the specification does not disclose any structure for imaging information ***inside*** the target.  However, this is not a legal basis for rewriting the claim as HHP asks by removing the limitation that the information be in the target and inserting the limitation that it be in the "field of view."

Although HHP admits that any corresponding structure for the "imaging means" must include image sensor 14, it continues to maintain that the electronics within image sensor 14 that interface to the video capture card are not part of the corresponding structure.[40]  There is no legal basis for modifying the disclosed structure in this way, and HHP's own inventor disagrees with HHP's position.  Soofian Decl. Ex. 7, 169:1-18.  HHP is again trying to excise the video capture card from the specification.  According to HHP, there is no need to interface to it, it has nothing to do with the claimed capturing function, and it is not a corresponding structure for ***any*** means-plus-function limitation.

---

[40]  HHP asserts that this and other means-plus-function limitations cannot be indefinite because Amazon identifies corresponding structure.  That is untrue.  What Amazon identifies is a subset of disclosed structures that would be required to perform the corresponding functions *whatever* they mean and *irrespective* of the fact that other necessary structures are not disclosed or clearly linked to the functions.  *See Noah Sys.*, 675 F.3d at 1318 (Fed. Cir. 2012).

**9)**  **"target…therein" (Claim 22)**

| Hand Held's Proposed Construction | Amazon's Proposed Construction |
|---|---|
| No construction necessary - plain and ordinary meaning | Inside the target |

  **i.**  **Hand Held's Opening Position**

Hand Held incorporates by reference its arguments in Section 1(i) and 8(i), *supra.*

  **ii.**  **Amazon's Answering Position**

Amazon incorporates by reference its arguments in Section 8(ii), *supra.*

  **iii.**  **Hand Held's Reply Position**

Hand Held incorporates by reference its arguments in Section 1(iii) and 8(iii), *supra.*

  **iv.**  **Amazon's Sur-Reply Position**

Amazon incorporates by reference its arguments in Section 8(iv), *supra.*

**10)**  **"processing means for processing an imaged target" (Claim 22)**

| Hand Held's Proposed Construction | Amazon's Proposed Construction |
|---|---|
| To the extent Amazon claims this is indefinite, the claim contains sufficient structure (i.e. a microprocessor) such that any presumption of the applicability of 112(f) is overcome.<br><br>If the Court finds that 112(f) applies, Hand Held proposes the following function and structure.<br><br>Function: processing an imaged target<br><br>Structure: Microprocessor 22 capable of receiving, outputting and processing image data in accordance with a stored program and equivalents thereof | A means-plus-function limitation governed by 35 U.S.C. § 112(f).<br><br>Function: processing an imaged target.<br><br>Structure: Indefinite. |

  **i.**  **Hand Held's Opening Position**

This claim term contains sufficient structure to overcome any presumption of the

applicability of 35 U.S.C. §112(f).  Although "the use of the term 'means' triggers a rebuttable

presumption that [§ 112 (f)] applies," the presumption can be overcome, if the claims recite sufficient structure to perform the function in its entirety. *TecSec v. Int'l Bus. Machines Corp*, 731 F.3d 1336, 1347 (Fed. Cir. 2013) (citation omitted).

Processing means is sufficient structure in that it need only be a microprocessor, well known in the art and to lay people. The parties do not dispute the function – processing an imaged target. A microprocessor is sufficient structure to perform the function in its entirety. *See id.* (finding that "[a] 'system memory' is sufficient structure to perform the 'storing data' function.)

If Court determines that §112(f) applies, the specification discloses sufficient structure. Microprocessor 22 is capable of receiving, outputting and processing image data in accordance with a stored program and equivalents thereof. 4:11-13. The structure includes Microprocessor 22 and equivalents thereof.

ii.     **Amazon's Answering Position**

The term "processing means" is presumptively governed by 35 U.S.C. § 112(f). *See Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1366 (Fed. Cir. 2008). Although HHP mistakenly contends that this presumption is overcome, that issue is not material because the limitation is indefinite for essentially the same reasons, whether it is governed by § 112(f) or not.

The function recited in the claim is "processing an imaged target . . ." However, the claim does not state what type of "processing" this requires — the whole specification is about processing images in different ways by different devices. For example, the "processing" could refer to the type of processing performed by the frame grabber (*e.g.*, analog to digital conversion), in which case the frame grabber 18 in Figure 1 would have to at least be a part of the "processing means." 4:64-5:2. Or, the "processing" could refer to storing, in which case the RAM 24 depicted in Figure 1 would have to at least be a part of the "processing means." 5:9-15.

66

Or, the processing could refer to displaying, in which case the computer monitor 30 depicted in Figure 1 would have to at least be a part of the "processing means."  5:1-2.  Or, the processing could refer to barcode decoding, in which case the microprocessor and barcode decoding software would have to at least be a part of the "processing means."  5:31-42.  Because there is no way to know what "processing" is being referred to, there is no way to know what device(s) constitute the "processing means" and what its structure is.  Although HHP assumes the "processing means" is a microprocessor, *supra* at 66, it provides no basis for that assumption.

For the above reasons, if Amazon is correct that this claim limitation is governed by § 112(f), it is indefinite because the specification does not "clearly link" any structure to the function of "processing."  It is also indefinite if HHP is correct that this limitation is not governed by § 112(f).  The term "processing means" by itself does not connote any specific type of structure to those skilled in the art — it can refer to anything that does any type of processing.  There is no basis to limit it to a microprocessor for the reasons stated above.  (HHP certainly has not submitted any evidence that "processing means" has a plain and ordinary meaning.)  Moreover, for the reasons discussed above, its claimed function of "processing" would not help to identify the structure of the "processing means."  Thus, irrespective of whether this claim limitation is governed by § 112(f) or not, it is indefinite.

### iii.      Hand Held's Reply Position

Amazon has failed to meet its burden to demonstrate that this claim limitation is indefinite by not presenting any evidence as to how "processing means" would be insolubly ambiguous to one of ordinary skill in art.  While Amazon offered the Bajaj declaration in support of its other constructions, it failed to cite the Bajaj declaration or any other evidence to support its conclusion that "[t]he term 'processing means' by itself does not connote any specific type of structure those skilled in the art." *Supra* at 67.

The function recited in the claims is processing the imaged target.  Contrary to Amazon's suggestions, one of ordinary skill in the art would understand this function performing operations on data of the imaged target in accordance with a software program.  Taavola Decl. Ex. J at 1091. (defining processing as "to perform operations on (data)").  The specification is clear that what "receive[s], output[s] and process[es] data in accordance with a stored program" is the microprocessor.  4:11-13.  The microprocessor is sufficient structure to perform the function in its entirety.  *TecSec*, 731 F.3d at 1347.

### iv.     Amazon's Sur-Reply Position

HHP still refuses to identify what "processing" this limitation refers to.  Without knowing what kind of "processing" is referred to, there is no way to know which structure(s) in the specification are incorporated into the claim by § 112(f).  For this reason, this limitation is indefinite.  HHP's contention that the corresponding structure is a microprocessor which processes an "imaged target in accordance with a software program" is wrong for the reasons we explained in Section 10(ii), *supra*.  However, even if HHP was correct, it does not identify that software or incorporate it into the structure of this limitation.  Accordingly, this limitation is indefinite even under HHP's construction.  *Aristocrat Techs. Austl. Pty Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1333 (Fed. Cir. 2008); *EON Corp. IP Holdings, LLC v. FLO TV Inc.*, CV 10-812-RGA, 2014 WL 906182, *2-3 (D. Del. Mar. 4, 2014) (Andrews, J.)

11)   **"display means for continually displaying a real-time image of said target from said imaging and processing means" (Claim 22)**

| Hand Held's Proposed Construction | Amazon's Proposed Construction |
|---|---|
| Function: displaying a real-time image of said target<br><br>Structure: Output/Display 30 and equivalents thereof. | A means-plus-function limitation governed by 35 U.S.C. § 112(f).<br><br>Function: continually displaying a real-time image of said target from said imaging and processing means.<br><br>Structure: Indefinite.<br><br>In the alternative, the corresponding structure would have to include at least an analog PC video monitor. (4:24-27, 4:62-5:8.) However, this is not sufficient structure to perform the corresponding function. |

i.      **Hand Held's Opening Position**

The parties agree that this claim term is means-plus-function and is governed by U.S.C. §112(f).  But the parties identify different functions and structures.  The function of the display means is displaying a real-time image of said target.  The specification states that the invention relates to an image capturing apparatus that captures and decodes bar code information "from a continuously displayed video signal of a particular target." 1:8-11.  In describing the preferred embodiment, the specification discloses that the structure that displays the continuous video signal of the target is displayed in Output/Display 30.  Figure 1, 5:1-11.  The "display means" is Output/Display 30.  Figure 1; 5:1-11.  This is not complicated and would include the disclosed structure and equivalents thereof.  Yet, Amazon insists that the structure is indefinite, or alternatively, wants to sweep in additional structure that is not disclosed in the patent – the fictitious red wire analog cable.  *See Wenger Mfg., Inc.*, 239 F.3d at 1233.

69

### ii.      Amazon's Answering Position

The parties agree that the term "display means" is governed by 35 U.S.C. § 112(f).  The claim itself makes clear that the function of the "display means" is "continually displaying a real-time image of said target *from said imaging and processing means* . . ." Because, as explained in sections 8 and 10 above, the "imaging means" and the "processing means" are indefinite, the display means is also indefinite, as there is no way to tell which two different structures the "display means" must be capable of interfacing with, or what structure in the specification is "clearly linked" to this function.

HHP doesn't have any answers either, so once again its solution is to just try to remove limitations from the claim.  Here, HHP inexplicably truncates the claimed function such that it reads "displaying a real-time image of said target," thereby excising the "continually," "imaging means" and "processing means" limitations completely.  It provides no basis for doing so, and that is obviously impermissible.

If, for whatever reason, the Court were to find that this means-plus-function limitation is not indefinite, the corresponding structure would have to include at least "an analog PC monitor."  As explained in Section 3 above, the "continually" limitation that HHP tries to remove refers to an analog signal, which can only be displayed on an analog monitor.

### iii.      Hand Held's Reply Position

Amazon's sole argument is that this claim term is indefinite because it argues that the image means and processing means are indefinite.  As shown in detail above, the image means limitation and the processing means limitation are definite.  Amazon has failed to carry its burden to show that the image means limitation, the processing means limitation or that the display means are indefinite.

Amazon undercuts its argument that the display means limitation is indefinite by then proposing a construction.  Amazon argues, without citing any support, that the display means should be limited to an analog VGA monitor.  As Amazon acknowledged during the Technology Tutorial, the patent does not use the word analog when describing the display.  Taavola Decl. Ex. B at 3.  The patent is clear that the "display means" is Output/Display 30.  Figure 1; 5:1-11; 1:8-11.

### iv.    Amazon's Sur-Reply Position

HHP appears to now concede that the "display means" must display video from ***both*** the "processing means" and the "imaging means."  Yet, it still cannot point to any disclosed device which displays video from two different sources, because no such structure is disclosed.  Thus, even if "processing means" and "imaging means" were not indefinite (which they are), the display means would still be indefinite.

HHP does not believe the monitor has to be analog, because it is still attempting to vitiate the "continually" requirement from the limitation.  Moreover, HHP's construction of "output/display 30" must be rejected because those words do not identify a structure.

12)     **"image capture means for selectively capturing at least one image displayed by said display means" (Claim 22)**

| Hand Held's Proposed Construction | Amazon's Proposed Construction |
|---|---|
| Function: for selectively capturing (see construction above) at least one image displayed by said display means.<br><br>Structure: Keyboard, Mouse, Timer, Etc. 34 and Microprocessor 22 programmed and configured to perform the recited function; Figure 2, "Assert Decode" Condition 125; and equivalents thereof. | A means-plus-function limitation governed by 35 U.S.C. § 112(f).<br><br>Function: selectively capturing at least one image displayed by said display means<br><br>Structure: Indefinite.<br><br>In the alternative, the corresponding structure would have to include at least (i) a Flashpoint Lite video capture card (4:6- 9); (ii) imaging optics, an image sensor such as a CCD or CMOS and an electronic interface providing analog electrical signals to the Flashpoint Lite video capture card (3:55-62, 4:3-4, 4:62-67); (iii) a keyboard, mouse and timer (4:24-27; 4:44-54 and 5:9-27); and (iv) a Compaq Pentium 120 mhz PC (4:6-9) with special programming that implements the functions described at 4:44-61, including the ability of a user to press a keyboard key, to press a mouse button and to set a timer in order to select the time when the image capture will occur. |

i.      **Hand Held's Opening Position**

The parties agree that this claim term is means-plus-function and is governed by U.S.C.

§112(f).  The parties also agree on the function.  The structure is apparent from the specification.

Microprocessor 22 processes data in accordance with a stored program.  4:11-15.  On

initial start-up, Microprocessor 22 loads a program that sets system variables "such as the mode

of decoding, of triggering, etc." that are each activated." 4:36-40.  The structure for designating

an image for attempted decode can found Figure 1, "Keyboard, Mouse, Timer, Etc." 34.  Figure

1.  This trigger can be a variety of things, but in each instance, some sort of condition or set of

conditions is applied.  4:44-54.  For example, conditions could be that that the image is properly

placed in the field of view, there is a resolved (i.e. focused) image on the monitor or that the

processor elects to capture images at some set time interval.. 2: 39-44; 5:20-22; 2:6-15; 4:51-54. These are just examples of the type of criteria or conditions that can be set and are not limiting. What is important is that the image capture means designates and places into memory an image for attempted decode based on the quality/condition of the image. 2:6-15; 5:9-16; JCC Ex. E at 2. This process can be done by the user or "automatically and without human intervention." 2:53-57; 3:14-19; 3: 24-25; 5:26-27; 5:30-33.

While Amazon asserts that this limitation is indefinite, it was able to identify structure. Yet, the structure Amazon identifies is flawed. Amazon adds numerous pieces of structure in an attempt to limit the claims to a specific brand of computer, the imaging optics and a specific brand of frame grabber. Such structure is unnecessary to perform the recited function – selectively capturing at least one image displayed by said display means. *See Wenger Mfg., Inc.*, 239 F.3d at 1233.

### ii.     Amazon's Answering Position

The parties agree that the term "image capture means" is governed by 35 U.S.C. § 112(f) and that its function is "selectively capturing at least one image displayed by said display means." The limitation is indefinite because, as explained in Section 4 above, the only disclosed way to capture "selectively" requires a human being, but a human cannot be a corresponding structure to a means - plus - function claim element. *Default Proof*, 412 F.3d at 1300.

HHP suggests that there is support for the microprocessor performing "selectively capturing" by applying "conditions [that] could be that the image is properly placed in the field of view, there is a resolved (i.e., focused) image on the monitor or that the processor elects to capture images at some set time interval." *Supra* at 72-73. However, the specification does not disclose that the microprocessor can do any of those things — it is the user that does them. It is the user that aims the camera to place the image in the field of view and decides when to capture

based on the displayed image.  5:20-22.  It is the user that determines if the image on the

computer monitor is in focus and decides when to capture based on the displayed image.  5:20-

27.  And, as explained above, it is the user that sets the timer.  Thus, the only selectivity disclosed

in the specification is selectivity based on human judgment.  That is the reason why, although

HHP concedes that the corresponding structure must include programming, it did not identify

any disclosed programming in its construction of the structure — there is no such programming.

HHP's failure to identify specific programming in its construction is alone sufficient reason to

reject its construction, as a microprocessor without the specific software to perform the

selectively capturing function is insufficient structure.  *Aristocrat Techs.*, 521 F.3d at 1333 (Fed.

Cir. 2008) ("[I]n a means-plus-function claim 'in which the disclosed structure is a computer, or

microprocessor, programmed to carry out an algorithm, the disclosed structure is not the general

purpose computer, but rather the special purpose computer programmed to perform the disclosed

algorithm.'"); *EON Corp.,* 2014 WL 906182, *2-3 ("where the corresponding structure is a

computer, the patent must disclose an algorithm for performing the claimed function").

     Of course, HHP's construction should also be rejected because the structure it identifies

as corresponding to the "image ***capture*** means" does not even include the disclosed Flashpoint

Lite "video ***capture*** card," which performs capturing in the specification.

     HHP complains that Amazon is improperly trying to limit the claims "to a specific brand

of computer," "a specific brand of frame grabber," etc.  *Supra* at 73.  There is nothing improper

about this, as that is the law.  Under 35 U.S.C. § 112(f), those brands of devices are the disclosed

structures, and the claims require those, or the structural "equivalents thereof."

     If, for whatever reason, the Court were to find that this means-plus-function limitation is

not indefinite, the Court must include as corresponding structures at least all of the disclosed

components and specialized programming required for capture, including programming for identification of user inputs for capture (4:44-61), the structures used to initiate capture (a keyboard, a mouse and user controlled timer) (4:24-27; 4:44-54; 5:9-27), imaging optics for "receiving and focusing an image" (3:55-62), a sensor to convert the light into voltages (3:55-62), an electronics interface to create an analog signal representing the image (4:3-6; 4:62-67), the Compaq Pentium based PC with all of the necessary programming (4:6-9) and, of course, the Flashpoint Lite "video **capture** card" (4:6-9; 4:66-5:2; 5:27-30).

### iii.    Hand Held's Reply Position

Amazon has not offered clear and convincing evidence that the claim term is indefinite. Amazon argues that "selectively capturing" is indefinite because "selectively" requires human interaction. *Supra* at 73-74. Relying on *Default Proof*, Amazon claims that a human being cannot serve as the necessary structure to support a means-plus-function claim. *Id*. Amazon incorrectly applies Default Proof to the facts of this case. A patent can invoke human interaction and not run afoul of 112(f) concerns as long as the user merely operates a claimed structure. *E.g., Rest. Techs., Inc. v. Jersey Shore Chicken*, 2007 U.S. Dist. LEXIS 84451 at 830 n. 5 (D.N.J. Nov. 15, 2007) (citing *Default Proof*, 412 F.3d at 1300). Here, the user is not the corresponding structure for "selectively capturing" an image. Rather, the user simply operates certain structures described in several embodiments of the patent, *e.g*., the hot key or mouse.

Regardless of whether the selective capturing is triggered by the user or automatically, it is the microprocessor receiving a signal from any of a number of sources: a timer (4:51-54); a "hot key" or mouse (4:46-51) or other host devices (Claim 6) and their equivalents that actually performs the recited function. For this reason, Amazon's assertion that the selective capturing requires a human is in direct conflict with the patent specification. *See*, 2:53-57 (the invention "automatically and without human intervention capture[s] and decode[s] a video input…").

Each of these devices is capable of signaling the microprocessor to designate a real time image from the stream of images on the bus for attempted decoding.

The structure identified by Hand Held – Figure 1, "Keyboard, Mouse, Timer, Etc" 34 and Microprocessor 22 programmed and configured to perform the recited function; Figure 2, "Assert Decode" 125 and equivalents thereof – is sufficient to perform this designation. *See Wenger Mfg., Inc*., 239 F.3d at 1233. Amazon is incorrect in its contention that Hand Held's structure is deficient because it does not disclose an "algorithm." The law does not require that Hand Held disclose a mathematical algorithm or code; rather, prose is sufficient to disclose the corresponding structure. *Finisar*, 523 F.3d at 1340; *University of Pittsburgh of the Commonwealth Sys. of Higher Education v. Varian Medical Sys., Inc.*, 2014 U.S. App. LEXIS 6559 at *18-20 (Fed. Cir. Apr. 10, 2014) (non-precedential) (finding that a single statement in the specification was sufficient structure and disclosed and algorithm.) Amazon is also wrong to limit the structure to one implementation – that of the user triggering the selectively capturing step. But, sufficient structure does not require that the algorithm include every possible implementation of the function. *See Harris v. Ericsson, Inc.*, 417 F.3d 1241, 1254 (Fed. Cir. 2005) (declining to limit the algorithm to the specific implementations described in the patent and noting that aspects of the algorithm can vary based on implementation.).

Finally, Amazon's argument that the claim is indefinite is undercut by its ability to identify the corresponding structure as including a specific brand of computer and a specific brand of frame grabber. Even then, Amazon does not cite a single case in which the structure requires using a specific brand, and the branded product at issue does not perform the selectively capturing function.

####    iv.    Amazon's Sur-Reply Position

As explained in Section 4 above, the only disclosed "means" for doing anything "selectively" is a human being.  The human must therefore be part of the means for "selectively" capturing.  HHP's reliance on a case which permits a claimed structure to be operated by a human is therefore inapposite.  HHP's reliance on cases discussing the level of detail required for a corresponding software algorithm are also inapposite, as HHP does not identify *any* corresponding algorithm or structure which makes "selective" decisions.  And, HHP still provides no explanation for why neither this limitation nor any other means-plus-function limitation includes as corresponding structure the "video ***capture*** card."  HHP's inventor agreed that the system "wouldn't work" without it.  Soofian Decl. Ex. 7, 177:10-15.

13)     **"scanning means for scanning said at least one captured image and for determining the presence of bar-coded information in the field of view of said at least one captured image" (Claim 22)**

| Hand Held's Proposed Construction | Amazon's Proposed Construction |
|---|---|
| Function: scanning at least one captured image and determining the presence of barcoded information in the field of view of said image.<br><br>Structure: Microprocessor 22 programmed and configured to calculate the rate of change between portions of the captured image data, and equivalents thereof and to look for possible bar code symbols in the captured data by identifying regions of high activity, and equivalents thereof; Figure 2, "Attempt Decode" 135; and equivalents thereof. | A means-plus-function limitation governed by 35 U.S.C. § 112(f).<br><br>Function: scanning said at least one captured image and determining the presence of bar-coded information in the field of view of said at least one captured image<br><br>Structure: Indefinite.<br><br>In the alternative, the corresponding structure would have to include at least a Compaq Pentium 120 mhz PC (4:6-9) with special programming for identifying all candidate bar code symbol regions in the captured image as described in steps 305 and 315 of Figure 4 and at 5:53-6:24, and to scan at least one candidate bar code symbol region as described in steps 330, 335, 340 and 345 of Figure 4 and at 6:49-7:17. |

i.       **Hand Held's Opening Position**

The parties agree that this claim term is means-plus-function and is governed by U.S.C. §112(f).  The parties also agree on the function.  The structure is apparent from the flow charts described in the specification.  Figure 2 "Attempt Decode" 135 is the beginning of the process flow for the scanning means.  Microprocessor 22 attempts to decode any symbols present in the field of view.  5:14-15; 5:31-33.  It does this first by scanning the image, calculating the rate of change between the portions of the captured image data.  5:53-57.  Microprocessor 22 is programmed and configured to look for possible bar code symbols in the captured data by identifying regions of high activity.  6:14-19.  The corresponding structure is thus Microprocessor 22, programmed and configured with these algorithmic steps and equivalents thereof.

78

As it has with other limitations, Amazon asserts that this limitation is indefinite, while at the same time it offers a construction, identifying structure. Yet, the structure Amazon identifies is flawed. Amazon adds numerous pieces of structure in an attempt to limit the claims, for example, to a specific brand of computer. Such additional pieces of structure are unnecessary to perform the recited function. *See Wenger Mfg., Inc.*, 239 F.3d at 1233.

### ii.       Amazon's Answering Position

The parties agree that the term "scanning means" is governed by 35 U.S.C. § 112(f), and the parties agree that the function includes at least "determining the presence of bar-coded information in" an image. This function corresponds to the step of "determining if bar-coded information is present in said stored image" in claim 1, discussed in Section 6 above.

This function of the scanning means is related to the function of the claim 22 "decoding means" (discussed in Section 14 below), which is to decode any bar-coded information that the scanning means determines is present. As explained in Section 6 above, however, the specification does not teach the two step process of "determining" if there are barcode symbols and then decoding any symbols determined to be present. Instead, the specification explicitly says that the only way to determine whether something is a barcode symbol is if it is successfully decoded. 6:28-30. Thus, even assuming that "bar-coded information" means barcode symbols (and there is no way to know whether that is the case or not), this limitation is indefinite. Because the two-step process is not disclosed, there is no disclosed structure "clearly linked" to the performance of either of those two interrelated steps. This claim limitation is therefore indefinite.

The corresponding structure HHP identifies in its brief are specification excerpts that describe locating "regions of high activity," which are only used to identify "*candidate* bar code symbols" — they may be bar-code symbols or they may not be. *See* 6:15-24. These techniques

cannot be used to determine if those regions actually contain barcode symbols.  Moreover, HHP does not even include in its proposed structure the entire algorithms for locating such candidate barcode symbols, but only those small portions it determined should be included for infringement purposes.  Nor does HHP include the disclosed Compaq Pentium based PC on which these algorithms must run.  If, for whatever reason, the Court were to find that this means-plus-function limitation is not indefinite, any corresponding structure would have to include at least all of this.

### iii.    Hand Held's Reply Position

Amazon has not and cannot meet its burden to show that this limitation is indefinite.  Amazon did not cite any evidence that would lead one of ordinary skill in the art to find the claim insolubly ambiguous.  Amazon argument is based upon its lack of understanding as to how barcodes are decoded.  Amazon's argument is based upon the incorrect notion that the determining the presence of bar-coded information and decoding bar code information are sequential steps.  This is incorrect.  As described in detail above, determining and decoding happen concurrently.  Therefore, calculating the rate of change between portions of the captured image data and looking for possible bar code symbols by identifying regions of high activity is conducted by the scanning means as part of determining.  While this processing is going on, the microprocessor is also decoding the symbology.  The algorithmic steps described in Column 5 and 6 and reflected in relevant portions of Figure 4 are sufficient structures that corresponding to performing the function.  One of ordinary skill in the art would understand these structural steps based on their disclosure.  *See* Allais Declaration, ¶¶12-13, 17.  In contrast, Amazon attempts to add structure that is not required to perform the function, including a specific brand of computer. *See Wenger Mfg.*, 239 F.3d at 1233.

### iv.  Amazon's Sur-Reply Position

HHP merely repeats its unsupported statement that "determining" and "decoding" are two steps that happen concurrently.  As explained in Section 6 above, the parties agree that the specification discloses that both "determining" and "decoding" are performed by the same ***single*** "decoding" step.  Because the "determining" function of the scanning means cannot be distinguished from the "decoding" function of the decoding means, both "means" are indefinite.

**14)  "decoding means for decoding any bar-coded information detected by said scanning means" (Claim 22)**

| Hand Held's Proposed Construction | Amazon's Proposed Construction |
|---|---|
| To the extent Amazon claims this is indefinite, the claim contains sufficient structure (i.e. a barcode decoder) such that any presumption of the applicability of 112(f) is overcome.<br><br>If the Court finds that 112(f) applies, Hand Held proposes the following function and structure.<br><br>Function: decoding any bar-coded information detected by the scanning means.<br><br>Structure: Microprocessor 22 executing standard available decoding software for any desired barcode symbologies, and/or programmed and configured to binarize scan line data and then applying the rules of the desired symbolog(ies) to the spatial relationships reflected in that binarization; Figure 2, "Attempt Decode" 135, Figure 2, "Decode Data" Condition 140; Figure 4, "Binarize Scan Line Values" 350, Figure 4, "Attempt 1D Decode" 355, Figure 4 "1D Decode Successful?" 360, and equivalents thereof. | A means-plus-function limitation governed by 35 U.S.C. § 112(f).<br><br>Function: decoding any bar-coded information detected by said scanning means.<br><br>Structure: Indefinite. |

### i.  Hand Held's Opening Position

This claim term contains sufficient structure to overcome any presumption of the applicability of 35 U.S.C. §112(f).  *TecSec*, 731 F.3d at 1347 (presumption can be overcome).

Structure is sufficient if "the claim term is used in common parlance or by persons of skill in the

pertinent art to designate structure, even if the term covers a broad class of structures and even if

the term identifies the structures by their function." *Id.* (citation omitted).

Sufficient structure exists for decoding means. The parties do not dispute the function –

decoding any bar-coded information detected by said scanning means. A "decoding means" is a

decoding algorithm/software. This is sufficient structure to perform the function in its entirety.

*See id.* (finding that "[a] 'system memory' is sufficient structure to perform the 'storing data'

function). The prosecution history demonstrates that decoding software was well known in the

art. JCC Ex. D at 8, ¶ 2. Even Amazon admits that bar coding and bar code decoding algorithms

were well known in art. Taavola Decl. Exs. B, slide 4; A, 37:4-8; 7:3-13:3; 35:15-17.

If Court determines that the §112(f) applies, the specification discloses sufficient

structure. The specification discloses that Microprocessor 22 executing standard available

decoding software for any desired barcode symbologies. *See* Figs. 6-9; 1:26-62 (citing among

other things, U.S. Patent Nos. 4,794,239; 5,340,786 (sic 5,304,786); U.S. Ser. No. 08/504,643

(now U.S. 5,773,806), 08/516,185, 08/697,914 (now U.S. 5,932,862)); 8:66- 9:41, (citing among

other things U.S. Ser. No. 08/504,643 (now U.S. 5,773,806), 08/441,446 (now U.S. 5,591,956);

JCC Ex. D at 8, ¶ 2. This decoding software was known and commercially available. *See*

*Elcommerce.com Inc. v. SAP AG*, No. 2011-1369, 2014 U.S. App. LEXIS 3357, at *32 (Fed. Cir.

Feb. 24, 2014) (noting that "section 112 does not require the drafter 'to encumber the

specification' with information known to a person of skill in the field of invention; nor does

section 112 require that the specification reproduce information routinely possessed by persons

in the field of invention."). Alternatively, the specification discloses that Microprocessor 22 is

programmed and configured to binarize the scan line and apply the rules of the desired

symbolog(ies) to the spatial relationships reflected in that binarization.  7:18-23, 7:28-36.  The specification provides further structural support with the process flow of the decoding means at Figure 2 "Attempt Decode" 135; Figure 2 "Decode Data" Condition; Figure 4 "Binarize Scan Line Values" 350, Figure 4, "Attempt 1D Decode" 355, Figure 4 "1D Decode Successful?" 360.

### ii.        Amazon's Answering Position

The term "decoding means" is presumptively governed by 35 U.S.C. § 112(f).  *Net MoneyIN*, 545 F.3d at 1366 (Fed. Cir. 2008).  HHP attempts to overcome the presumption by arguing that "decoding means" is a "decoding algorithm/software."  *Supra* at 82 (relying on *TecSec*, 731 F.3d at 1347 (Fed. Cir. 2013)).  However, the function here is not just decoding, but "decoding any bar coded information detected by the scanning means."  As explained in the preceding section, the specification admits that it is impossible to accomplish this function — if the scanning means detected a barcode, that means it decoded the barcode, and there is nothing left for the "decoding means" to do.  Because the function is impossible to accomplish, there were no structures known in the art to perform this function, and the presumption that this is a means-plus-function limitation has not been overcome.  And, the limitation is indefinite, because the specification does not "clearly link" any structure to this impossible-to-accomplish function.[41]

### iii.        Hand Held's Reply Position

Amazon has not and cannot show that this claim term is indefinite.  Amazon failed to cite a single piece of evidence to demonstrate that this claim term is insolubly ambiguous.  Rather, Amazon's argument is based on its incorrect understanding of decoding barcodes.  As described

---

[41] This limitation is also indefinite because HHP does not identify a structure that can decode "any" bar-coded information.

in detail above, determining the presence of bar code information and decoding the barcode are not sequential steps, but rather, occur concurrently. The scanning means operates concurrently with the decoding means. The claim contains sufficient structure (*i.e.* a barcode decoder) such that the presumption of the applicability of 35 U.S.C. §112 (f) is overcome. *TecSec*, 731 F.3d at 1347 (Fed. Cir. 2013); *see also*, Allais Decl., ¶¶12-13, 17. If the Court finds that 112(f) applies, Hand Held has identified sufficient structure to perform the recited function.

### iv.     Amazon's Sur-Reply Position

Amazon incorporates by reference its arguments in Section 13(iv), *supra.*

**15)    "output means for outputting the decoded bar-coded information to said display means" (Claim 22)**

| Hand Held's Proposed Construction | Amazon's Proposed Construction |
|---|---|
| Function: outputting the decoded barcode-information to the display means. | A means-plus-function limitation governed by 35 U.S.C. § 112(f). |
| Structure: Microprocessor 22 programmed and configured to send a message; Figure 2, "Output Message" 145; and equivalents thereof. | Function: outputting the decoded bar-coded information to said display means. Structure: Indefinite. |

### i.     Hand Held's Opening Position

The parties agree that this claim term is means-plus-function and is governed by U.S.C. §112(f). The parties also agree on the function. The structure of the output means is apparent from the specification.

Figure 2 of the patent discloses the algorithmic step of "Output Message" 145, if decoding is successful, messages are outputted. 5:38-39. Microprocessor 22 is programmed and configured to send a message. 4:11-16, 4:54-61. This outputting can take the form of outputting to the display, saving to an ASCII file, sending messages (requests/responses) to a host processor, a keyboard buffer, or other convenient means. *Id.* Microprocessor 22, programmed and configured to perform this ministerial step, and its equivalents is sufficient structure.

### ii.    Amazon's Answering Position

The parties agree that the term "output means" is governed by 35 U.S.C. § 112(f), and they agree that the function is outputting the decoded bar-coded information to the display means.  The limitation is indefinite because no algorithms are disclosed for the performance of this function — even HHP cannot, and does not, identify any algorithms.  *Aristocrat Techs*, 521 F.3d at 1333; *EON Corp.*, 2014 WL 906182, *2-3.  It is also indefinite because the "display means" to which the bar-coded information must be outputted is indefinite.

If, for whatever reason, the Court were to find that this means-plus-function limitation is not indefinite, HHP's construction must be rejected because its corresponding structure only requires that a microprocessor and (unidentified) programming "send a message" without specifying where the message has to be sent — according to the claim, to the "display means." HHP's brief clearly explains that the reason HHP's construction does not include "display means" is that HHP is trying to vitiate it from the claim.  According to HHP, the output does not have to be to the "display means," but can instead be to *anything*: "outputting the decoded barcode-information to the display means" includes "saving to an ASCII file, sending messages (requests/responses) to a host processor, a keyboard buffer, or other convenient means"  Section 15(i) *Supra*.  HHP's attempt to rewrite this claim limitation must be rejected.

### iii.    Hand Held's Reply Position

Amazon has not and cannot offer clear and convincing evidence that the claim term is indefinite.  Amazon has not offered any evidence, but rather, relies on attorney argument. Amazon claims that this term is indefinite because it argues that the display means is indefinite (despite the fact that Amazon identified the function and corresponding structure for the display means).  Hand Held identified sufficient structure to perform this function – Microprocessor 22 programmed and configured to send a message; Figure 2 "Output Message" 145 and equivalents

thereof.  Amazon argues that this structure is deficient because it does not specify where the message is being sent.  This is irrelevant to the structure.  There is no dispute about *function*. Microprocessor 22 programmed and configured to perform this ministerial step, and its equivalents, is sufficient structure.  The display does not output and is not part of the structure

### iv.    Amazon's Sur-Reply Position

This limitation requires on its face that the "output means" output to the "display means," yet HHP still inexplicably insists that structures which output to "an ASCII file," "a keyboard buffer," "a host processor" etc. can be the "output means," even if they cannot output to a "display means." HHP is wrong.  And HHP still does not identify a corresponding algorithm.

16)     **"discrimination means for discriminating the type of bar-coded information present in said at least one captured image" (Claim 22)**

| Hand Held's Proposed Construction | Amazon's Proposed Construction |
| --- | --- |
| Function: discriminating the type of barcoded information present in said at least one captured image<br><br>Structure: Microprocessor 22, programmed and configured to perform any or all of the following programming loops reflected in Figures 4 and 5 (depending upon the types of barcode symbologies for which the apparatus is configured).<br><br>Specifically:<br><br>Discriminating means for a 1D barcode is the programming loop beginning with "No" in Figure 4 "ID Decode Successful?" Condition 360, continuing with the repeating steps directed by "Entire Region Scanned" Condition 365 or "Any Remaining Unexamined Regions" Condition 375<br><br>Discriminating means for 1D Stacked barcodes is the programming loop beginning with "Yes" in Figure 4 "1D Decode Successful?" Condition 360, continuing with the repeated steps directed by "ID Stacked Symbol?" Condition 380, "Entire Region Scanned?" Condition 395, and "Any Remaining Unexamined Regions?" Condition 390.<br><br>Discriminating means for 2D barcodes is the programming loop beginning at "Decode Successful" Condition 535 in Figure 5, continuing with the repeated steps directed by "Any Unused Finders" Condition 545 | A means-plus-function limitation governed by 35 U.S.C. § 112(f).<br><br>Function: discriminating the type of bar-coded information present in said at least one captured image.<br><br>Structure: Indefinite. In the alternative, the corresponding structure would have to include at least a Compaq Pentium 120 mhz PC (4:6-9) with special programming for determining the type of barcoded information as described in steps 305 through 397 in Figure 4, steps 505 through 550 in Figure 5 and at 5:36- 10:10. |

i.      **Hand Held's Opening Position**

The parties agree that this claim term is means-plus-function and is governed by U.S.C.

§112(f).  The parties also agree on the function.  The structure of the output means is apparent

from the specification.

87

Portions of Figures 4 and 5 reflect the discrimination means. The discrimination means depends on what barcode symbologies the apparatus is configured to decode. The discrimination is based on a trial application of various bar code algorithms. 7:31-36. These programming loops depend upon a successful decode. *Id.* Microprocessor 22 is programmed and configured to perform any or all of the programming loops reflected in Figures 4 and 5. 5:33-36. These programming loops begin with a determination that the decode was not successful and repeat the steps as necessary.

As it has with other limitations, Amazon asserts that this limitation is indefinite, while identifying structure. Yet, the structure Amazon identifies is flawed. Amazon adds numerous pieces of structure in an attempt to limit the claims, for example, to a specific brand of computer. Such additional pieces of structure are unnecessary to perform the recited function. *See Wenger Mfg., Inc.*, 239 F.3d at 1233.

### ii. Amazon's Answering Position

The parties agree that the term "discrimination means" is governed by 35 U.S.C. § 112(f) and agree on its function. However, the specification cites no structure at all corresponding to "discriminating the type of bar-coded information present," as the specification does not disclose an algorithm capable of determining the type of bar-coded information present in an image. HHP essentially admits this, and argues that "discrimination" is done by trying to decode the barcode, *i.e.*, if the information is decoded using a 1-D barcode decoding algorithm then it has been discriminated as a 1-D barcode. *Supra.* By defining "discriminating" to mean decoding, though, HHP reads claim 23's addition of "discrimination means" out of the claim entirely — claim 22, from which it depends, already includes a "decoding means." For these reasons, this claim limitation is indefinite.

If the term "discrimination means" is not found to be indefinite, the court should adopt as the corresponding structure all of what the specification calls the "autodiscrimination" steps — all of Figures 4 and 5 — and the Compaq Pentium 120 mhz PC which performs them.  8:37-40.  There is no basis to pick and choose only certain steps from those figures and not others as HHP has done.

### iii.    Hand Held's Reply Position

Amazon asserts that this claim term is indefinite.  Amazon has not and cannot carry its burden.  Amazon fails to cite a single piece of evidence to support its position.  Rather, Amazon relies on attorney argument to claim that the term is indefinite, while at the same time alternatively identifying its function and structure.  Amazon's identified structure includes additional pieces that are not required to perform the function.  *See Wenger Mfg*., 239 F.3d at 1233.  Only portions of Figures 4 and 5 reflect the discrimination means; others relate to the previously recited scanning means and/or decoding means, or other claimed functions.  The discrimination means depends on what symbologies the apparatus is configured to decode and is based on the algorithmic loops reflections a trial of various barcode symbologies.  7:31-36.  While discriminating between barcodes requires an attempted decode, it is not the same thing, as illustrated by the algorithmic loops Hand Held identified.

### iv.    Amazon's Sur-Reply Position

HHP says that "while discriminating between barcodes requires an attempted decode, it is not the same thing."  However, the only support HHP cites is 7:31-36, which teaches that discriminating is done by decoding, just as we explained above in Section 16(ii).

OF COUNSEL:

Martin R. Lueck
Matthew L. Woods
Sara A. Poulos
Thomas C. Mahlum
Lars P. Taavola
Larina A. Alton
Matthew J. M. Pelikan
Robins, Kaplan, Miller & Ciresi L.L.P.
800 LaSalle Avenue, Suite 2800
Minneapolis, MN 55402
612-349-8500
mrlueck@rkmc.com
mlwoods@rkmc.com
sapoulos@rkmc.com
tcmahlum@rkmc.com
lptaavola@rkmc.com
laalton@rkmc.com
mjmpelikan@rkmc.com

/s/ Jason Rawnsley
Frederick L. Cottrell, III (#2555)
Jason Rawnsley (#5379)
Richards, Layton & Finger, P.A.
One Rodney Square
920 N. King Street
Wilmington, DE  19801
cottrell@rlf.com
rawnsley@rlf.com

*Attorneys for Plaintiff
Hand Held Products, Inc.*


OF COUNSEL:

David S. Benyacar
Daniel L. Reisner
David Soofian
KAYE SCHOLER LLP
425 Park Avenue
New York, NY 10022
(212) 836-8000
dbenyacar@kayescholer.com
dreisner@kayescholer.com
dsoofian@kayescholer.com

/s/ Lauren E. Maguire
Steven J. Balick (#2114)
Lauren E. Maguire (#4261)
Andrew C. Mayo (#5207)
ASHBY & GEDDES
500 Delaware Avenue
P.O. Box 1150
Wilmington, DE 19899
(302) 504-3700
sbalick@ashby-geddes.com
lmaguire@ashby-geddes.com
amayo@ashby-geddes.com

*Attorneys for Defendants
AMAZON.COM, INC.,
AMZN MOBILE LLC,
AMAZONFRESH LLC,
A9.COM, INC.,
A9 INNOVATIONS LLC,
and QUIDSI, INC.*

DATED: May 1, 2014